**In re Bernard BETTIS, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 02–BG–1285.**

District of Columbia Court of Appeals.

Argued Nov. 17, 2003.

Decided Aug. 5, 2004.

Elizabeth A. Herman, Senior Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel, was on the brief, for the Office of Bar Counsel.

Elizabeth J. Branda, Executive Attorney, for the Board on Professional Responsibility.

Melvin G. Bergman, Belstsville, MD, for respondent.

Before TERRY, REID, and GLICKMAN, Associate Judges.

TERRY, Associate Judge:

The Board on Professional Responsibility ("the Board") has recommended that respondent, Bernard Bettis, be publicly censured for violating Rules 1.5(c) (failure to put contingency fee agreement in writing), 1.15(b) (failure to notify and deliver funds to third-party claimant) and 1.17(a) (failure to designate trust or escrow account) of the District of Columbia Rules of Professional Conduct. Bar Counsel noted an exception to the sanction recommended by the Board, arguing that respondent's disciplinary history required a thirty-day suspension with a fitness review. Respondent has not challenged either the Board's conclusion that he violated the three rules or the sanction that it recommended. We adopt the Board's recommendation that respondent be publicly censured. We conclude, however, that in light of respondent's prior disciplinary history, a mere censure is inadequate to protect the public. We therefore direct that, in addition to the censure, respondent be placed on probation for a period of two years under certain conditions, including the appointment of a practice monitor, as set forth in part III of this opinion.

## I

### A. *Respondent's Disciplinary History*

In 1984 respondent was disbarred by consent for commingling funds. *See In re Bettis*, 644 A.2d 1023 (D.C.1994) ("*Bettis I* "). The charges that brought about his disbarment stemmed from two separate matters. In the first case, respondent was charged with illegal conduct involving mor-

al turpitude (Disciplinary Rule (DR) 1–102(A)(3)), dishonesty (DR 1–102(A)(4)), commingling funds (DR 9–103(A)), failing to maintain records (DR 9–103(B)(3)), and neglect (DR 6–101(A)(3)). These charges arose out of his unauthorized use of funds which he held as successor guardian of the estates of five minor children. In his Affidavit of Consent to Disbarment, respondent acknowledged only a violation of DR 9–103(A) (commingling funds).[1] *Bettis I,* 644 A.2d at 1028. In the second case, he was charged with neglecting a legal matter (DR 6–101(A)(3)) and failing to carry out a contract of employment with a client (DR 7–101(A)(2)). These charges related to his representation of a client in an appeal from an adjudication of paternity and the entry of a support order. *Id.*

Several years later respondent filed a petition for reinstatement. He informed the court that if he were readmitted, he would not handle fiduciary cases and that he intended to associate with other attorneys who had established bookkeeping systems. He also indicated that he was aware of the need to maintain separate accounts for client funds. *Id.* at 1029. We

granted his petition for reinstatement on July 25, 1994. *Id.* at 1030.

### B. *Respondent's Recent Violations*

On April 10, 2001, Bar Counsel filed a new petition instituting formal disciplinary proceedings against respondent. The petition contained two separate counts. In Count I (the Whitehead matter, BDN 83–00), Bar Counsel alleged that respondent had violated Rule 1.5(c) by failing to put a contingency fee agreement in writing.[2] In Count II (the Wells matter, BDN 299–00), respondent was charged with violating Rule 1.15(b) by failing to pay a health care provider from settlement funds in which the health care provider had an interest.[3] Count II also alleged that respondent had violated Rule 1.17(a) by failing to deposit settlement funds in an escrow account.[4]

### 1. *The Whitehead Matter*

In March of 1998, respondent was retained to represent David Whitehead in a malpractice action against Mr. Whitehead's former attorney. The two agreed that respondent's fee would be one-third of the recovery, but that agreement was not put in writing. After the case was settled

---

1. When respondent submitted his affidavit, other charges were still pending against him. Those charges included alleged violations of DR 1–102(A)(3) (illegal conduct involving moral turpitude), DR 1–102(A)(4) (engaging in dishonest, fraudulent, and deceitful conduct in handling a guardianship estate and reporting to the court on the guardianship), DR 9–103(B)(3) (failing to maintain complete records of guardianship funds), and DR 6–101(A)(3) (neglecting an appellate case). *See Bettis I,* 644 A.2d at 1028.

2. Rule 1.5(c) states in part: "A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined ...."

3. Rule 1.15(b) states in part:
 Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client

or third person.... [A] lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive ....

4. Rule 1.17(a) states:
 Funds coming into the possession of a lawyer that are required by these Rules to be segregated from the lawyer's own funds (such segregated funds hereinafter being referred to as "trust funds") shall be deposited in one or more specially designated accounts at a financial institution. The title of each such account shall contain the words "Trust Account" or "Escrow Account," as well as the lawyer's or the lawyer's law firm's identity.

in August of 1998, Mr. Whitehead fired respondent in an apparent attempt to avoid paying the one-third contingency fee. Respondent, however, received his fee after executing an attorney's lien on one-third of the settlement funds.

## 2. *The Wells Matter*

On March 13, 2000, Rudolph Wells received medical treatment at the Washington Family Wellness Center ("WFWC") for injuries he received in an automobile accident. When he was treated, Mr. Wells informed the WFWC that he was represented by T. Clarence Harper. At that time, however, Mr. Harper was suspended from the practice of law in the District of Columbia as a result of his disbarment in Maryland. On March 14 Mr. Wells retained respondent, who had taken over Mr. Harper's law practice, to handle his claim from the automobile accident.[5] Mr. Wells told respondent that he had received medical treatment at District of Columbia General Hospital.

Shortly thereafter, Mr. Wells signed an "Assignment of Benefits" form provided by the WFWC.[6] Respondent also signed the form, which he returned to the WFWC on March 29, 2000. By signing the form, respondent agreed that he would ensure that the WFWC's bill for medical treatment would be paid from any funds received in Mr. Wells' case. Respondent testified before the hearing committee, however, that although he had signed the form provided by the WFWC, it did not put him on notice that Mr. Wells had been treated by the WFWC.[7] After he explained that he "routinely" received and signed assignment forms because health care providers do not provide treatment until they receive a signed form, the following exchange took place between respondent and a member of the hearing committee:

Q. Mr. Bettis, knowing that you had an authorization and assignment from a health care provider, would you have routinely, prior to any disbursement, have contacted them anyway just because you had the authorization and assignment?

A. No. We would not have done that since we had not heard from this Center [WFWC] in any way.

Q. So the authorization and assignment is not something you would automatically call somebody just to see what the status was?

A. No.

Mr. Wells accepted a settlement offer of $2,600.00 on May 31, 2000.[8] Two days later, on June 2, respondent deposited the settlement check[9] in a Bank of America account entitled "T. Clarence Harper & Assoc. P.C.," which respondent believed to be an escrow account. In fact, however,

---

5. Although respondent testified before the hearing committee that he had been engaged to take over Mr. Harper's practice during Harper's suspension, he was not hired as a partner or associate in Harper's firm, and there was no written agreement defining his relationship with the firm.

6. An Assignment of Benefits form is typically used in an accident case to secure payment to a health care provider when the matter has been concluded or whenever the attorney receives the client's funds. *See, e.g., In re Smith,* 817 A.2d 196, 198 n. 1 (D.C.2003).

7. On April 13, 2000, the WFWC mailed a bill for $385 to Mr. Harper because its files showed that Mr. Harper was Mr. Wells' attorney. The record does not disclose whether respondent ever received a copy of this bill.

8. At some point before the settlement was agreed upon, respondent met with Mr. Wells to discuss his claims for medical expenses. Mr. Wells did not inform respondent at that time that he had been treated by the WFWC.

9. The check was made out jointly to Mr. Wells and respondent.

it was not an escrow account; neither the checks used for the account nor the bank's corporate signature cards, which were signed by Mr. Harper, identified it as such. Moreover, respondent did not have signatory authority over the account, nor did he have the power to withdraw the settlement funds once they were placed in the account.[10]

When the settlement funds were distributed from the account, the bill from the WFWC was not paid. After these disciplinary proceedings were instituted against respondent, the Harper firm discovered that the account used in Mr. Wells' case was not an escrow account. New signature cards were prepared and signed and new checks were printed, and by July 2000 the account was again [11] identified as an escrow account. Respondent signed a signature card as an authorized signatory on the new escrow account on September 22, 2000.

### C. *The Recommended Sanction*

After considering all the charges, the hearing committee found that, with respect to Count I, respondent had violated Rule 1.5(c); as for Count II, however, it found that he had not violated Rules 1.15(b) and 1.17(a). The committee recommended an informal admonition. Bar Counsel noted two exceptions to the hearing committee's report and recommendation. First, Bar Counsel challenged the committee's finding that respondent had not violated Rules 1.15(b) and 1.17(a). Second, Bar Counsel voiced disagreement with the recommended sanction, arguing that respondent's disciplinary history required that he be suspended for thirty days, to be followed by a fitness review. Bar Counsel

also asked the Board to recommend that respondent be required to pay restitution in the amount of $385 to the WFWC. Respondent did not note an exception to the hearing committee's decision.

In its report and recommendation, the Board found that respondent had indeed violated Rules 1.5(c), 1.15(b) and 1.17(a). The Board noted, however, that the Rule 1.15(b) violation "was certainly understandable against the backdrop of a client who never mentioned that he had received services from WFWC and WFWC's failure to reflect Respondent's name in its audit record as the responsible attorney ...." As for the Rule 1.17(a) violation, the Board remarked that it "reflected, in part, the failures of the internal mechanisms of the Harper firm," and that the account was converted to an escrow account as soon as the problem became known.

The Board also recommended that respondent be publicly censured. In concluding that his disciplinary history did not require either a thirty-day suspension or a fitness review, the Board explained:

> ... While it is disheartening to see Respondent before the disciplinary system once again, we note that the three violations are of a relatively minor nature and there is no suggestion that Respondent mishandled any of the funds involved.... We do not agree [with Bar Counsel] that Respondent's prior disciplinary history should increase the sanction in this case to the level of a thirty-day suspension with fitness as Bar Counsel has urged; nor do we agree [with the hearing committee] that an informal admonition from Bar Counsel ... is a sufficient sanction when there

---

10. Mr. Harper later signed the checks that were written on the account when the settlement funds were distributed.

11. Although the account was not an escrow account when respondent deposited the settlement check in June 2000, it had been identified as an escrow account in 1997 and 1998.

are three violations committed by an attorney with a prior history of discipline that includes disbarment. . . .

Given the sanctions for the individual violations, we do not believe that the three violations, taken together, rise to the level of a suspensory sanction. Nor do we think that a fitness requirement is required simply because Respondent has a past history with the disciplinary system.

The Board concluded by stating, "It is our hope that a public censure by the Court will serve as a wake-up call to Respondent and other members of this Bar who fail to honor the terms of assignments that they execute." It also ruled that respondent should not be required to pay restitution to the WFWC.

Bar Counsel noted an exception to the sanction recommended by the Board, asserting that respondent's disciplinary history warranted a thirty-day suspension with a fitness requirement. Respondent did not file an exception to the Board's report and recommendation.

## II

 This court's Rules Governing the Bar state that the court "shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar Rule XI, § 9(g)(1). "Generally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed." *In re Goffe*, 641 A.2d 458, 463–464 (D.C.1994); *see also, e.g., In re Shaw*, 775 A.2d 1123, 1126 (D.C.2001). However, "[w]hen the court disagrees with the Board as to the seriousness of the offense . . . the Board's recommendations are accordingly granted less weight." *In re Kennedy*, 542 A.2d 1225, 1228 (D.C. 1988) (citing *In re Reback*, 513 A.2d 226, 230–231 (D.C.1986) (en banc)). "In the final analysis, the responsibility to discipline lawyers is the court's. The buck stops here." *In re Shillaire*, 549 A.2d 336, 342 (D.C.1988); *see also, e.g., In re Ryan*, 670 A.2d 375, 380 (D.C.1996) ("the ultimate choice of a sanction rests with this court" (citation omitted)). We determine what the appropriate sanction should be by considering "the nature of the violation, aggravating and mitigating circumstances, the absence or presence of prior disciplinary sanctions, the moral fitness of the attorney, and the need to protect the legal profession, the courts, and the public." *In re Lenoir*, 604 A.2d 14, 15 (D.C.1992) (citations omitted); *see also, e.g., In re Haupt*, 422 A.2d 768, 771 (D.C.1980). "Our purpose . . . is not to punish the attorney; rather, it is to offer the desired protection by assuring the continued or restored fitness of an attorney to practice law." *In re Steele*, 630 A.2d 196, 200 (D.C.1993); *see also, e.g., In re Temple*, 596 A.2d 585, 591 (D.C.1991) (sanctions are "a means of assuring the attorney's fitness to practice and for protecting the public from misconduct").

The basic issue in this case is whether the Board properly considered respondent's disciplinary history in recommending that he be publicly censured. There is no dispute that respondent violated Rules 1.5(c), 1.15(b) and 1.17(a). Bar Counsel contends, however, that the Board's recommendation of public censure is too lenient in light of respondent's prior record, and that respondent's disciplinary history requires that we impose a thirty-day suspension with a fitness review. While we agree with Bar Counsel that the Board failed to give sufficient weight to respon-

dent's prior record, we are not persuaded that a thirty-day suspension with a fitness review is warranted. The practical consequence of imposing such a sanction, *i.e.*, a *de facto* one-and-a-half to two-year suspension while respondent's fitness is established,[12] is too harsh in light of the fact that our goal here is "to serve the public and professional interests ... rather than to visit punishment upon an attorney." *In re Reback*, 513 A.2d at 231.

On the other hand, we do not agree with the Board that public censure is an adequate sanction in this case. In particular, we conclude that the Board did not give sufficient weight to respondent's prior disciplinary history, and especially to the fact that his earlier disbarment involved the mishandling of client funds. Accordingly, we choose to follow an intermediate course by ordering a public censure, as recommended by the Board, but imposing in addition a two-year period of probation during which respondent shall be overseen by a practice monitor. *See* D.C. Bar Rule XI, § 3(a)(7) (the court may impose probation "for not more than three years ... in lieu of *or in addition to* any other disciplinary sanction" (emphasis added)); *In re Stow*, 633 A.2d 782, 785 (D.C.1993) (ordering one-year probation and oversight by a practice monitor because of attorney's "style of practice" and "lack of organization"); *In re Bradbury*, 608 A.2d 1218, 1219 n.2 (D.C.1992) ("Nothing in our decisions prohibits the Board from recommending probation in a non-disability case").

In the present case, the Board found that respondent violated Rules 1.5(c), 1.15(b) and 1.17(a). A single violation of Rule 1.5(c) generally results in an informal admonition. *See In re Williams*, 693 A.2d 327 (D.C.1997). By itself, a violation of Rule 1.15(b) also generally results in an informal admonition.[13] When there has been a violation of both Rules 1.5(c) and 1.15(b), the usual sanction has been public censure. *See In re Warner*, 806 A.2d 1223 (D.C.2002). While there appear to be no reported cases in which an attorney violated only Rule 1.17(a), sanctions have ranged from public censure to a six-month suspension when a Rule 1.17(a) violation has been coupled with violations of Rules 1.15(a) (commingling funds) and 1.15(b). *See In re Graham*, 795 A.2d 51, 52 (D.C.2002) (public censure); *In re Anderson*, 778 A.2d 330, 332 (D.C.2001) (six-month suspension). Although the Board's recommended sanction of public censure appears to fall within the range of sanctions that have been imposed, we conclude that the aggravating factor of respondent's prior record—in particular, his 1984 disbarment—requires that the sanction be at the upper end of the disciplinary spectrum.

■ "[I]t has long been the practice in this jurisdiction to consider an attorney's disciplinary record in determining an appropriate sanction." *In re Rosen*, 481 A.2d 451, 455 (D.C.1984) (citations omitted); *see also In re Hutchinson*, 534 A.2d 919, 924 (D.C.1987) (en banc) ("prior disciplinary record is a factor which may be

---

**12.** Bar Counsel informed the court during oral argument that if the court imposed a thirty-day suspension with a required showing of fitness, it would probably take one and a half to two years for respondent's case to go through the review process.

**13.** An informal admonition, by its very nature, does not generally result in a published opinion from this court. The Board, howev-

er, cites two unpublished cases (*see* D.C. Bar Rule XI, § 9(g)(1), last sentence) in which it directed an informal admonition for a Rule 1.15(b) violation: *In re Eaton*, BDN 310–95 (June 3, 1997), and *In re Harvey*, BDN 214–95 (June 3, 1997). Each of those cases dealt with an attorney's failure to comply with the requirements of an assignment form.

considered in aggravation" (citation omitted)); *In re Reback*, 513 A.2d at 231 (disciplinary history is "highly relevant and material" (citation omitted)). An attorney's disciplinary history is an important factor because it "sheds considerable light on continued fitness." *In re Rosen*, 481 A.2d at 455. Respondent consented to disbarment in 1984 for commingling client funds.[14] With that in mind, we examine his current violations.

■ In this case the Board found that respondent failed to handle client funds properly because he deposited those funds in the non-escrow account of a suspended attorney.[15] Although respondent was not charged here with commingling, we cannot ignore the fact that he is before the court *again* for mishandling client funds. As we have remarked in other cases, "'where client funds are involved, a more stringent rule is appropriate' to ensure that 'there not be an erosion of public confidence in the integrity of the bar.'" *In re Pierson*, 690 A.2d 941, 949 (D.C.1997) (quoting *In re Addams*, 579 A.2d 190, 198 (D.C.1990) (en banc)). Moreover, we have recognized that there is a "need for approaches to sanctions which are tailored to assure the protection of the public by addressing specifically the circumstances which brought about the misconduct through probationary conditions." *In re Dunietz*, 687 A.2d 206, 212 (D.C.1996); *see also, e.g., In re Haupt*, 422 A.2d at 771 ("each case must be decided on its particular facts"). We find it deeply disturbing, in light of his

past disbarment, that respondent would deposit client funds in a bank account without first ensuring that it was a proper escrow account or that he had authority to withdraw or disburse funds from that account. For this reason we deem it appropriate to impose probation, with conditions specifically focused on respondent's handling of funds that are not his own, in addition to ordering a public censure.[16]

Respondent's statements about the way in which he deals with assignment forms also cause us great concern. Assignment forms are used to secure payments to third-party health care providers, *see In re Smith*, 817 A.2d at 198 n. 1, and respondent—indeed, any attorney—has a duty under Rule 1.15(b) to honor such assignments and abide by their requirements. *See In re Clower*, 831 A.2d 1030, 1033 (D.C.2003); *see also In re Gregory*, 790 A.2d 573, 578 (D.C.2002) (quoting Board report). Respondent's comments show that his attitude toward assignment forms poses a potential danger to third parties who use these forms to secure payment. Therefore, as a condition of probation, we conclude that respondent must pay restitution to the WFWC. *See* D.C. Bar Rule XI, § 3(b) (this court has the power to "require an attorney to make restitution ... to persons financially injured by the attorney's conduct ... as a condition of probation"); *In re Clarke*, 684 A.2d 1276, 1281 (D.C.1996) ("Because respondent promised by his signature on the authorization and

---

14. In his Affidavit of Consent to Disbarment in 1984, respondent acknowledged only a violation of DR 9–103(A) (commingling funds). There were, however, other charges pending against him when he submitted that affidavit. See note 1, *supra*.

15. Mr. Harper had been disbarred in Maryland, but in the District of Columbia he had only been temporarily suspended at the time the settlement check was deposited.

16. Even if the Harper account had been a proper escrow account, respondent did not have authority to withdraw or disburse funds from the account after they were deposited. We emphasize this point because we find it unsettling, to say the least, that respondent chose to use the account of a suspended attorney instead of establishing his own.

assignment to pay his client's medical bills out of the proceeds of settlement, the enforcement of such a promise is an appropriate use of the restitution provision of [Rule] XI, § 3(b)").

## III

It is therefore ORDERED that respondent, Bernard Bettis, be and hereby is publicly censured.

It is FURTHER ORDERED, pursuant to D.C. Bar Rule XI, § 3(a)(7), that respondent Bettis is placed on probation for a period of two years, during which time he shall be subject to a practice monitor selected by the Board on Professional Responsibility. The practice monitor shall oversee respondent's practice, paying particular attention to his use of escrow or trust accounts, his handling of client funds, and his exercise of fiduciary duties owed to third parties. The practice monitor shall also submit regular reports to the Board and Bar Counsel,[17] at such intervals as the Board may direct, but no less frequently than every six months.

Respondent's probation shall also be subject to the following conditions:

(1) Respondent shall promptly inform his clients that he has been placed on probation for failing to deposit client funds in an escrow account.

(2) If he has not already done so, respondent shall pay restitution to the WFWC in the amount of $385.00, plus interest from the earliest date on which settlement funds were distributed to any person or entity in Mr. Wells' case.

It is FURTHER ORDERED that within thirty days from the date of this opinion, respondent shall file with this court and the Board a statement agreeing to the conditions of probation herein set forth, including the appointment of a practice monitor. If he fails to file such a statement or to pay restitution to the WFWC within thirty days from the date of this order, respondent shall be subject to a thirty-day suspension with a fitness review.

---

17. *See, e.g., In re Ontell,* 724 A.2d 1204, 1205 (D.C.1999).