**In re Lucy R. EDWARDS, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 197020).**

**No. 00–BG–552.**

District of Columbia Court of Appeals.

Argued Feb. 3, 2005.

Decided March 17, 2005.

---

Karl W. Carter, Jr., Mount Rainier, for respondent.

Ross T. Dicker, Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Deputy Bar Counsel, was on the brief, for the Office of Bar Counsel.

Elizabeth J. Branda, Executive Attorney, for the Board on Professional Responsibility.

Before TERRY and GLICKMAN, Associate Judges, and KERN, Senior Judge.

GLICKMAN, Associate Judge:

This matter returns to us following our remand to the Board on Professional Responsibility. *See In re Edwards,* 808 A.2d 476 (D.C.2002). As our earlier opinion explained, the Board initially recommended that respondent Lucy R. Edwards be disbarred for reckless misappropriation of funds entrusted to her in four different client matters, in violation of Rule 1.15(a) of the District of Columbia Rules of Professional Conduct. We upheld the Board's finding that respondent misappropriated funds given to her by one of her clients, the Reverend Robert Ansah.[1] *Id.* at 482. We determined, however, that the Board's finding of misappropriation in three other client matters was not supported by substantial evidence. *Id.* The evidence therefore did not establish the "extensive pattern of misappropriation" on which the Board based its finding of recklessness and recommendation of disbarment. *Id.* at 485. We remanded respondent's case to the Board for reconsideration of its findings and recommendation. *Id.*

On remand, Bar Counsel conceded and the Board has found that respondent's single instance of misappropriation (involving the funds of Reverend Ansah) was neither intentional nor reckless but rather was merely negligent. In its initial report, the Board found that respondent also had committed other violations of the Rules, namely commingling of client funds with her own funds in violation of Rule 1.15(a), failing to deposit entrusted funds in a

1. In "accept[ing] the Board's finding that Ms. Edwards engaged in some form of misappropriation with regard to the Ansah funds," we summarized the essential facts as follows:

First, Edwards wrongly deposited in her operating account the check that Ansah gave her for settlement of the Washington Gas judgment, a clear violation of the prohibition against the commingling of client funds with her own. While the commingling in itself did not amount to misappropriation, Edwards engaged in misappropriation the instant she allowed the balance in her operating account to fall below the amount given to her by Reverend Ansah to satisfy his debt.

*Id.* at 482 (internal citations omitted). Although respondent maintained an escrow account in addition to her operating account, she also allowed the aggregate balance of both accounts to fall below the amount she received from Reverend Ansah. *See id.* at 479, 481. Like the Hearing Committee and the Board, we rejected respondent's claim that she was entitled to take a portion of the funds entrusted to her by Reverend Ansah as her fee.

properly designated trust or escrow account in violation of Rule 1.17(a), failing to maintain complete records of entrusted funds as required by Rule 1.15(a) and D.C. Bar R. XI, § 19(f), and failing to set forth in writing the rate or basis of her fee as required by Rule 1.5(b). In its report after remand, the Board concludes that these additional violations, "while serious in and of themselves, [did] not make Respondent's negligent misappropriation in this case *especially* grave in comparison to the run of negligent misappropriation cases that we have reviewed, many of which also involve commingling and failure to operate trust accounts in the proper manner." *See, e.g., In re Anderson,* 778 A.2d 330, 340 (D.C.2001) (citing cases). Respondent testified before the Hearing Committee that her mishandling of client funds was a product of confusion and disorganization within her office. The Board credits respondent with having "at least attempted to operate an accounting and record-keeping system with the assistance of her office staff, although that system went awry." In addition, the Board identifies several mitigating circumstances that, in its view, "significantly temper the gravity" of respondent's ethical missteps.[2]

■ The Board recommends that we suspend respondent from the practice of law for six months without conditioning her reinstatement on a demonstration of fitness. *See* D.C. Bar R. XI, § 3(a)(2). "Each case must be decided on its facts," the Board notes, but in its view "this case does not demonstrate the sustained and serious problems that have led the Court to order fitness in other cases." Concerned, however, that respondent "exhibited confusion [in her Hearing Committee testimony] about the current status of her operating and escrow accounts," and that she still may not have "adopted appropriate procedures in her office to ensure the safety of entrusted funds," the Board suggests that she be required to complete three hours of continuing legal education on the handling of such funds.

Both respondent and Bar Counsel take exception to the recommended sanction.[3] Respondent contends that a six-month suspension is too severe in light of the mitigating circumstances. Invoking *In re Kersey,* 520 A.2d 321, 327 (D.C.1987), respondent particularly faults the Board for disregarding evidence that her misconduct coincided with a stressful period in her life during which she suffered temporarily from a disabling, albeit "mild," depression. Bar Counsel counters that respondent waived her *Kersey* mitigation claim. Bar Counsel argues, further, that in view of

---

2. The Board listed the factors it considered in mitigation as follows:

> The misappropriation took place over a very short period of time; Reverend Ansah suffered no loss as a result of the misappropriation and expressed satisfaction with Respondent's representation; Respondent did not personally profit from the misused funds; and Respondent fully accomplished her client's objective to satisfy the Washington Gas [default] judgment. Moreover, Respondent has, as the Hearing Committee found, an "exemplary record of public service."

The Board also took into account the fact that respondent has practiced law in the District

of Columbia since 1965 and has no prior disciplinary record.

3. Resurrecting arguments that we considered and rejected when her case was last before us, respondent also continues to dispute the finding that her handling of the Ansah funds amounted to misappropriation. We did not remand respondent's case for the Board to reopen this issue, and respondent provides us with no sound reason to reconsider it. *Cf. In re Travers,* 764 A.2d 242, 247 (D.C.2000). We reaffirm our previous holding that the Board's finding of misappropriation of the Ansah funds was supported by clear and convincing evidence in the record. *See Edwards,* 808 A.2d at 482; D.C. Bar R. XI, § 9(g)(1).

respondent's depression and the unresolved questions about her ability even now to institute proper procedures for handling entrusted funds, respondent should be required to establish her fitness to practice law before she is reinstated.

■ Our practice under D.C. Bar R. XI, § 9(g)(1) is to adopt the sanction recommended by the Board "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." This practice "endorses the Board's exercise of broad discretion in handing out discipline that is subject only to a general review for abuse in that discretion's exercise." *In re Smith*, 403 A.2d 296, 303 (D.C.1979). We appreciate that the choice of sanction "is not an exact science but may depend on the facts and circumstances of each particular proceeding." *In re Goffe*, 641 A.2d 458, 463 (D.C.1994) (internal citation omitted). Indeed, "[e]ach of these decisions emerges from a forest of varying considerations, many of which may be unique to the given case." *Smith*, 403 A.2d at 303. Accordingly, we "respect the Board's sense of equity in these matters" unless the recommendation is patently unreasonable or is materially inconsistent with the sanctions that we have imposed in comparable cases. *Id.* In the final analysis, of course, the choice of appropriate sanction "is the responsibility and duty of this court." *Goffe*, 641 A.2d at 464.

■■ To ensure that we reach consistent dispositions, we necessarily compare the instant case with prior cases in terms of the misconduct at issue, the attorney's disciplinary history, and any legitimate mitigating or aggravating circumstances. The ultimate issue—whether a particular

sanction is warranted or not in a given case—requires us also to consider the individual qualifications and fitness of the attorney whose case is before us and, especially, the paramount need to protect the public, the courts, and the legal profession. *See, e.g., In re Weiss*, 839 A.2d 670, 672 (D.C.2003); *In re Corizzi*, 803 A.2d 438, 441–42 (D.C.2002). Thus, when the specific question is whether to require a suspended attorney to show fitness to be reinstated, we have examined both our practice in comparable cases and factors such as (1) the nature and circumstances of the attorney's misconduct, (2) whether the attorney appreciates the seriousness of the misconduct, (3) the attorney's subsequent conduct, including particularly remedial or preventive measures, (4) the attorney's present character, and (5) the attorney's present qualifications and competence to practice law. *See, e.g., In re Lopes*, 770 A.2d 561, 570 (D.C. 2001). The threshold question is "whether the passage of the suspension period alone, without further evaluation, will leave the court uninformed or concerned with respect to the enumerated factors, thus indicating that substantial questions remain about respondent's fitness to practice law." *In re Robinson*, 736 A.2d 983, 990 (D.C.1999) (internal citation omitted).

■ By and large, the foregoing considerations support the sanction recommended by the Board in this case. A six-month suspension without a fitness requirement is the norm for attorneys who have committed negligent misappropriation of entrusted funds together with the related violations (commingling, deficient record keeping) exhibited here.[4] Setting aside momentarily respondent's putative *Kersey* disability claim, the allegedly miti-

---

4. *See, e.g., In re Davenport*, 794 A.2d 602, 603–05 (D.C.2002); *Anderson*, 778 A.2d at 340, 342; *In re Chang*, 694 A.2d 877, 878 (D.C.1997); *In re Reed*, 679 A.2d 506, 508–09 (D.C.1996).

gating circumstances to which she points cannot be said to distinguish this case from the line of similar cases in which six-month suspensions have been imposed. *See, e.g., Davenport,* supra note 4, 794 A.2d at 603–05; *Chang,* supra note 4, 694 A.2d at 878; *Reed,* supra note 4, 679 A.2d at 508–09. By the same token, the fact that respondent's fund handling errors affected other clients besides Reverend Ansah, which Bar Counsel cites as an aggravating factor, does not differentiate this case from similar cases in which no fitness requirement was imposed. *See, e.g., Davenport, supra.* Moreover, as the Board recognizes, there exist factors in this case that affirmatively support allowing respondent to be reinstated without a showing of rehabilitation: she has practiced law for over three decades without having been disciplined previously; she did not profit personally from her ethical mistakes in this case; her clients were not harmed; the Board credits her good faith; she evidently does appreciate the seriousness of her misconduct; and she has at least attempted to reform her procedures.

However, there are two disputed issues that we need to address. The first is whether respondent's episode of depression at the time of her misconduct is either a mitigating circumstance under *Kersey* or a reason to impose a fitness requirement. The second is whether a fitness requirement is needed in light of the Board's concern that respondent remains confused about her responsibilities and has yet to establish appropriate procedures in her law office for handling entrusted funds.

With regard to the first issue, we think the Board is correct in attaching no significance either way to respondent's depression.

In *Kersey,* this court held that alcoholism may serve as a mitigating factor if the respondent attorney establishes that "but for" the alcoholism, the misconduct would not have occurred. 520 A.2d at 327. Following *Kersey*'s lead, we held in *In re Peek* that chronic depression may also constitute a mitigating factor provided that the same tight causal nexus between the depression and the misconduct is shown. 565 A.2d 627, 633 (D.C.1989). Specifically, in order to qualify for a reduced sanction on account of a disability such as depression, a respondent must demonstrate (1) by clear and convincing evidence that she had the disability at the time of her misconduct, (2) by a preponderance of the evidence that the disability substantially caused her to engage in that misconduct, and (3) by clear and convincing evidence that she has been substantially rehabilitated. *In re Stanback,* 681 A.2d 1109, 1114–15 (D.C.1996).

Respondent has never attempted to make such a demonstration in this case. When her case was first before the Hearing Committee and the Board, respondent offered no evidence or argument that her misconduct was attributable to her depression. Only after the Board's recommendation of disbarment was before this court did respondent seek to invoke the *Kersey* doctrine by moving to supplement the record with her therapist's report. In that one-page report, respondent's therapist stated that he treated her for depression over a nine-month period five years earlier (when respondent engaged in her ethical misdeeds) and that her condition "showed much improvement" by the end of the treatment. The report did not purport to attribute respondent's mishandling of entrusted client funds or other misconduct to her illness. Bar Counsel opposed respondent's eleventh hour effort to supplement the record on appeal. We denied respondent's motion. In our subsequent decision, we noted that the Board would have discretion on remand to consider any addi-

tional evidence in mitigation that respondent wished to present. *See Edwards,* 808 A.2d at 481 n. 6, 485.

When her case returned to the Board, however, respondent decided not to offer her therapist's report in evidence or to claim that her misconduct was causally related to her depression. Bar Counsel submitted a copy of the therapist's report in support of its request for a fitness requirement. Respondent objected that the report was not part of the record and asked the Board to disregard it because she "ha[d] not proffered any belated *Kersey*-type mitigation factor to this Board for consideration." Respondent insisted, moreover, that her mental condition was improved and therefore no longer relevant to the proceeding. Although the therapist's report confirmed that assertion, Bar Counsel opposed any re-opening of the record to take additional evidence on respondent's health. Bar Counsel maintained that respondent had waived her right to introduce such evidence by failing to offer it at the appropriate time before the Hearing Committee. Thereafter, neither party offered any additional evidence that respondent suffered from a disability.

In short, both parties actively and successfully strove to limit the evidence before the Board concerning respondent's mental condition. At most, the only such evidence was the therapist's report proffered by Bar Counsel and respondent's own assertion that she had suffered from depression six years earlier, had been treated for it, and had recovered from it. There was no evidence that respondent's

misconduct was attributable to her depression or that respondent still suffers from depression; if anything, the evidence is to the contrary.

■■■■ Having asked the Board to disregard her depression, respondent cannot complain in this court that it abided by her request, *see In re Austin,* 858 A.2d 969, 975 (D.C.2004); nor did the Board abuse its discretion in concluding that respondent waived her right to present *Kersey* mitigation evidence by failing to offer it before the Hearing Committee.[5] The Rules of the Board specifically provide that such a failure shall operate as a waiver of the right to present such evidence unless the Board finds good cause to excuse the default. *See* Board of Prof'l Responsibility Rule 11.11. Similarly, having opposed the introduction of evidence regarding respondent's mental health, Bar Counsel cannot complain that the Board found the evidence before it too insubstantial to justify a fitness requirement. In point of fact, the minimal evidence before the Board permitted no other outcome. As the Board noted, this court has held "that unless a causal nexus can be shown between [a respondent's] depression and the misconduct, the depression can be used neither in mitigation nor for enhancement of sanction." *Peek,* 565 A.2d at 633 (internal citations omitted). Where "a causal connection is not shown, depression that is insufficient for mitigation cannot be sufficient for a sanction ... imposed in addition to the maximum sanction that otherwise would be warranted." *Id.* (rejecting

5. As the Board explained,

Respondent, who has been represented by counsel throughout these proceedings, was on notice that the proper time to introduce mitigating evidence is at the Hearing Committee stage. *See* Board Rules 7.6 and 11.11. Respondent certainly had every incentive to introduce such evidence at the Hearing Committee stage, given that she was well aware from the beginning that this case might well result in her disbarment if the charges of misappropriation of client funds were sustained. Nor is there any indication that this supposed mitigating evidence was not reasonably available to her at the time of the hearing.

recommendation that a period of suspension be augmented by a two-year term of supervised probation "based merely on the 'potential' impact of respondent's depression on his practice of law").[6] Thus, in the case at bar, the mere fact that respondent suffered from depression at the time of the misconduct is insufficient to justify either a lesser sanction or an otherwise unwarranted fitness requirement.

It is true that an attorney who is shown to be *currently* incapacitated by serious depression (or other mental infirmity) may be suspended for that reason without any showing that the disability caused the attorney to violate the Rules of Professional Conduct. *See* D.C. Bar R. XI, § 13; *cf. In re Cooper,* 613 A.2d 938, 940 (D.C.1992) (imposing a fitness requirement on account of attorney's unresolved cocaine addiction even though the misconduct for which he was suspended was not attributable to his addiction); *see also In re Lyles,* 680 A.2d 408, 419 (D.C.1996) (Board report) (imposing a fitness requirement where, *inter alia,* respondent volunteered that she suffered from serious depression and made no showing that she had recovered from that illness). In the present case, however, Bar Counsel did not even try to establish that respondent is suffering from depression or other mental disability at the present time. The therapist's report that Bar Counsel proffered suggested otherwise.

In sum, as it has not been shown that respondent's depression either led her to commit the violations for which she is to be disciplined or likely causes her to be impaired at the present time, her depression should neither lesser nor enhance her sanction.

Turning to the second issue, the Board, based on respondent's own testimony, is concerned that she remains confused about her operating and escrow accounts and still has not adopted adequate procedures in her law office to safeguard entrusted funds. In a case involving more egregious conduct (and thus a significantly longer period of suspension) than this one, a comparable concern weighed in favor of a fitness requirement. *In re Fair,* 780 A.2d 1106, 1116 n. 25 (D.C.2001) (imposing fitness requirement "principally to allow respondent to demonstrate the adequacy of her procedures that will be followed to prevent a repetition of mishandling of client funds").[7] In cases more closely analogous to this one, however, we have been reluctant to require a showing of fitness, as that requirement may have the practical effect of greatly prolonging—even tripling or quadrupling—a respondent's period of suspension. *See In re Bettis,* 855 A.2d 282, 288 (D.C.2004); *Steele,* 630 A.2d at 201 n. 5; D.C. Bar R. XI, § 16(d)-(g). Nonetheless, where a respondent manifestly has difficulty implementing necessary reforms, some effective means of protecting the public must be instituted. The question before us, therefore, is whether there exists a reasonable alternative to a fitness requirement.

Sensitive to the need for such an alternative, the Board recommends that respondent be required to complete three

---

6. *Compare, e.g., In re Steele,* 630 A.2d 196, 201 (D.C.1993) (imposing fitness requirement where attorney's psychological problems "caused her" to abandon a client's case and it remained uncertain whether those problems had been resolved), *with In re Sumner,* 665 A.2d 986, 990 (D.C.1995) (declining to impose a fitness requirement where attorney's neglect of criminal appeal was not shown to have been caused by his depression).

7. The misconduct in *Fair* involved "two distinct acts of misappropriation" of the assets of an estate combined with "a serious pattern of neglect in other respects" in connection with the administration of the estate. 780 A.2d at 1115.

hours of appropriate CLE course work concerning the handling of entrusted funds before she resumes her law practice.[8] Although we agree that this CLE requirement is appropriate, we are not persuaded that it would be sufficient by itself. After three decades practicing law, respondent now has been through a disciplinary process which nearly resulted in her disbarment. She has had every opportunity and incentive to master her ethical responsibilities. She claims to have reviewed her office procedures and to have consulted with other attorneys about the proper way to handle client funds and keep records. If respondent is still "confused" about her obligations, as the Board perceived her to be, we are not confident that three hours of remedial instruction is enough. In these circumstances, the public deserves more protection. In asking for a fitness requirement, Bar Counsel suggests, and we agree, that some form of oversight is necessary to ensure that respondent operates her escrow account and handles entrusted funds correctly.

Such oversight can be accomplished without a fitness requirement, however. At oral argument, we asked counsel whether the goals of discipline might be achieved in this case through the use of a financial practice monitor as an alternative to the imposition of a fitness requirement. Counsel for all parties responded favorably to this suggestion. We have relied on monitors in other cases where appropriate to help respondents remedy specific practice deficiencies that were at .the root of their disciplinary violations. For example, we recently placed an attorney who was censured for failing to deposit client funds in an escrow account on probation subject to a practice monitor who would "oversee respondent's practice, paying particular attention to his use of escrow or trust accounts, his handling of client funds, and his exercise of fiduciary duties owed to third parties." Bettis, 855 A.2d at 290. We directed the practice monitor to submit regular reports to keep the Board apprised of the attorney's progress. Id.[9]

We typically require practice monitoring as a condition of probation in lieu of or in addition to other disciplinary sanctions. See D.C. Bar R. XI, § 3(a)(7). Failure to cooperate with practice monitoring then exposes the attorney to revocation of probation and the imposition of any other permissible disciplinary sanction to the extent stated in the order imposing probation. See, e.g., In re Larsen, 633 A.2d 797 (D.C.1993). We also may require a respondent to cooperate with a practice monitor while on suspension as a condition of reinstatement. See D.C. Bar Rule XI, § 3(b) (authorizing the imposition of "any other reasonable condition").

We do not suggest that practice monitoring is appropriate for every case, or that it is always a suitable alternative to a fitness requirement. Monitoring services are a scarce as well as valuable resource that should not be called upon indiscriminately.[10] However, in the present case, we

---

8. Counsel for respondent represents that she has already fulfilled the recommended CLE requirement.

9. Other recent original discipline cases in which we have employed practice monitors include In re Baron, 808 A.2d 497 (D.C.2002); In re Vohra, 762 A.2d 544 (D.C.2000); In re Ontell, 724 A.2d 1204 (D.C.1999); In re Pullings, 724 A.2d 600 (D.C.1999); In re Covington, 720 A.2d 561 (D.C.1998); In re Dunietz,

687 A.2d 206 (D.C.1996); and In re Stow, 633 A.2d 782 (D.C.1993).

10. "[T]here are a limited number of attorneys in the District of Columbia who are willing to serve as practice monitors, as service with groups such as the Lawyers Practice Assistance Committee (LPAC) takes significant time and patience." In re George, 726 A.2d 1237, 1241 (D.C.1999) (Board report).

believe that a monitor would be the most practical and effective method of protecting the public and advancing the goals of attorney discipline. By overseeing respondent's office procedures, record keeping, escrow and trust account management, and handling of entrusted funds, the monitor can help assure that respondent not only understands but also fulfills her ethical obligations. Assuming that respondent cooperates in good faith, monitoring should obviate the need for a fitness requirement in this instance. On the other hand, if respondent fails to institute or to follow proper procedures or otherwise fails to cooperate, the monitor can sound an early alarm—an advantage not realized by the imposition of a fitness requirement. Further, use of a practice monitor has the additional advantage of not prolonging respondent's suspension beyond its set term.

Therefore, in all respects but one, we adopt the sanction recommended by the Board. We shall suspend respondent for six months.[11] In lieu of requiring her to demonstrate fitness as a condition of reinstatement, we shall require respondent to complete appropriate CLE and, in addition, to allow a practice monitor to oversee her record keeping, escrow and trust accounts, and handling of client funds. The practice monitor's oversight shall continue after respondent's reinstatement for six months as a condition of probation. Our order follows:

1. Respondent Lucy R. Edwards is hereby suspended from the practice of law in the District of Columbia for the period of six months. Respondent's attention is directed to the requirements of D.C. Bar R. XI, § 14, and their effect on her eligibility for reinstatement, see D.C. Bar R. XI, § 16(c).

2. As a condition of her reinstatement and before she resumes the practice of law following her period of suspension, respondent shall file with the Board on Professional Responsibility and Bar Counsel a certification that she has attended three hours of appropriate continuing legal education courses concerning the handling of entrusted funds.

3. As a further condition of her reinstatement and before she resumes the practice of law following her period of suspension, respondent shall begin cooperating with a practice monitor selected by the Board on Professional Responsibility. The practice monitor shall assist and advise respondent regarding her record keeping, escrow and trust accounts, handling of client and other entrusted funds, and related matters. At the conclusion of respondent's period of suspension, the practice monitor shall submit a report to the Board, with a copy to Bar Counsel. If respondent does not cooperate with the practice monitor during her period of suspension, she shall be required to demonstrate fitness as a condition of reinstatement pursuant to D.C. Bar R. XI, § 16.

4. Upon her reinstatement, respondent shall be on probation for a period of six months. During that period, respondent

---

11. In view of the seriousness with which we view even unintentional misappropriation of client funds, and consistent with our policy of deference to the Board's recommendations, we do not stay any portion of respondent's suspension. As we stated in *Davenport,*

> only a showing of truly exceptional circumstances will cause the court to depart from the normal sanction of actual suspension, for a significant period of time, for com-

> mingling and misappropriation of the kind presented here.... The virtual certainty of disbarment or a six-month suspension for acts of misappropriation serves the public and the profession by providing a powerful deterrent for any attorney who might contemplate engaging in this most serious misconduct.

794 A.2d at 605 (internal quotation marks and citation omitted).

shall continue to be subject to the oversight of the practice monitor selected by the Board on Professional Responsibility. The practice monitor shall report on respondent's progress to the Board and to Bar Counsel at such intervals as the Board may direct, and in any event at the third and sixth month of her probation. Respondent shall be required as a condition of her probation to cooperate with the practice monitor. Failure to cooperate shall constitute a violation of her probation that will subject respondent to revocation of probation and the imposition of a period of suspension of up to six months with a requirement that she furnish proof of rehabilitation as a condition of her reinstatement thereafter.

5. Respondent shall not be required to notify clients of her probationary status.

*So ordered.*