*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-BG-0943

IN RE PABLO A. ZAMORA, RESPONDENT.

A Suspended Member of the Bar of
the District of Columbia Court of Appeals
(Bar Registration No. 998467)

On Report and Recommendation
of the Board on Professional Responsibility
(Disciplinary Docket No. 2017-D142)
(Board Docket No. 21-BD-003)

(Submitted November 16, 2023                    Decided March 7, 2024)

*Robert C. Bonsib*, for respondent.[1]

*Hamilton P. Fox, III*, Disciplinary Counsel, with whom *Julia L. Porter*, Deputy Disciplinary Counsel, *Theodore (Jack) Meltzer*, Senior Assistant Disciplinary Counsel, and *Caroll Donayre*, Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before BECKWITH, DEAHL, and SHANKER,* *Associate Judges*.

---

[1] Mr. Bonsib filed a motion to withdraw as counsel less than a month before the scheduled oral argument. The court granted Mr. Bonsib's motion to withdraw and ordered that the case be submitted on the record and briefs filed by counsel without oral argument.

BECKWITH, *Associate Judge*: A hearing committee determined that Respondent Pablo Zamora violated a number of the Rules of Professional Conduct, including Rule 1.15(a), misappropriation of client funds, and Rule 1.15(e), failure to hold unearned advance fees in trust. A majority of the hearing committee concluded Mr. Zamora had misappropriated client funds negligently rather than recklessly and recommended a six-month suspension for the negligent misappropriation.[2] On review, the Board on Professional Responsibility agreed with the hearing committee's findings except for its conclusion that Mr. Zamora acted negligently. The Board determined that he acted recklessly and recommended that he be disbarred. Mr. Zamora urges us to adopt the hearing committee's conclusions in full. We agree with the hearing committee's conclusion that Mr. Zamora acted negligently and accordingly adopt the committee's recommended sanction.

---

* Associate Judge AliKhan was originally assigned to this case. Following Judge AliKhan's appointment to the U.S. District Court for the District of Columbia, effective December 12, 2023, Judge Shanker has been assigned to take her place on the panel.

[2] Mr. Zamora was also issued two additional one-month suspensions pursuant to his violations of Rule 1.3(a), Lack of Diligence and Zeal, and Rule 1.16(d), Terminating Representation, ordered to pay restitution in the amount of $750.00 plus interest, and required to attend a continuing legal education program regarding flat-fee billing practices.

## I.

Rule 1.15(a) requires attorneys to hold client property in a separate trust account; Rule 1.15(e) specifies that "[a]dvances of unearned fees and unincurred costs" qualify as client property until they are earned, and must be kept in a separate trust account pursuant to Rule 1.15(a) "unless the client gives informed consent to a different arrangement." Flat fees received at the outset of a representation are considered unearned fees and are subject to the requirements of Rule 1.15(e). *In re Mance,* 980 A.2d 1196, 1205 (D.C. 2009).

"Informed consent" as defined by the rules generally requires an attorney to communicate "adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Rule 1.0(e). To obtain informed consent to a flat-fee arrangement, attorneys must make five specific disclosures:

> (1) 'the attorney will treat the advance fee as the attorney's property upon receipt'; (2) 'the attorney can keep the fee only by providing a benefit or providing a service for which the client has contracted'; (3) 'the fee agreement must spell out the terms of the benefit to be conferred upon the client'; (4) 'the client must be aware of the attorney's obligation to refund any amount of advance funds to the extent that they are unreasonable or unearned if the representation is terminated by the client'; and (5) 'unless there is agreement otherwise, the attorney must . . . hold the flat fee in escrow until it is earned by the lawyer's

provision of legal services.'

*In re Ponds*, 279 A.3d 357, 359 (D.C. 2022) (quoting *In re Mance*, 980 A.2d at 1206-07).

## II.

Mr. Zamora was hired to represent an undocumented man, Jose Ascensio, in removal proceedings.[3] Mr. Zamora determined that the best way for Mr. Ascensio to avoid deportation would be to apply for a U-Visa. But partway through his representation of Mr. Ascensio, Mr. Zamora filed a motion to withdraw as counsel. He testified that he was frustrated by Mr. Ascensio's wife, Teka Stiles, using other attorneys' advice to second guess his own and concerned by his client's request that he continue an upcoming bond hearing in hopes of appearing before a more favorable judge. Mr. Ascensio and Ms. Stiles agreed to the withdrawal and Ms. Stiles asked for a detailed bill to account for the flat fees. Mr. Zamora provided her with a bill, which Ms. Stiles did not initially challenge. She later sought a refund for both matters and filed for fee arbitration in D.C., but was told that she had not exhausted all avenues of relief. Ms. Stiles then filed the underlying bar complaint

---

[3] The hearing committee explained its decision to "refer to Mr. Ascensio Torres as 'Mr. Ascensio' and [his wife] Teka Stiles-Ascensio as 'Ms. Stiles'" as consistent with how they were referred to during the hearing. We adopt the same approach.

against Mr. Zamora.

Because Mr. Zamora contests only the Board's determination of reckless misappropriation, we recite only the facts relevant to that determination. Prior to beginning any work on Mr. Ascensio's case, Mr. Zamora provided Mr. Ascensio's wife, Ms. Stiles, with two fee agreements, one for the U-Visa matter and one for the removal proceeding. The fee agreements differed in describing the work to be completed and the fee amount, but both contained a waiver provision stating, "I hereby WAIVE the requirement that the flat fee, given to Pablo A. Zamora, Esq. for work to be performed on my behalf, is to be held in trust." The waiver provision erroneously referred to "Rule 1.15(d)" as support for this provision because Rule 1.15(d) stated the rule regarding unearned fees until a rule change 2010, when it was renumbered as Rule 1.15(e). *See* Order, No. M-235-09 (D.C. Mar. 22, 2010). Each agreement also clarified the specific benefits to be conferred upon the client pursuant to the flat-fee agreement, and Mr. Zamora's obligation to refund any unearned portion of the flat fee should the client terminate the attorney-client relationship. Ms. Stiles signed and initialed all the provisions of both fee agreements, including the waiver provision.

Mr. Zamora testified that he discussed each page of the retainer agreement

with prospective clients and explained the flat-fee provision. He specifically told Ms. Stiles the flat-fee provision "meant that [the fees] would not be placed into a trust account. And [he] further advised her . . . of her right to an accounting of the money or return of any unused funds." Mr. Zamora testified that he did not think Rule 1.15(e) required him to notify clients of the risks of not using a trust account. In his view, there were not any material risks that necessitated such an explanation because he would have refunded any unearned fees. He said he believed that, to obtain informed consent, he was required to inform clients "in writing" that the flat fee would not be placed into a trust account and to have them "initial" "if they agree[d]" to that arrangement. He testified that he could not recall *In re Mance*, which sets out the specific requirements for informed consent in the flat-fee context. Ms. Stiles testified that Mr. Zamora "skimmed through" the agreements without discussing any of the risks or consequences of not using a trust account for client fees. The hearing committee deemed both Mr. Zamora and Ms. Stiles not entirely credible, and concluded that Mr. Zamora did not go through the fee agreements with Ms. Stiles as thoroughly as he testified to, but that he did review them "somewhat."

Having made this finding, the hearing committee determined that Mr. Zamora failed to obtain informed consent from Ms. Stiles, pointing to Mr. Zamora's own testimony that he did not explain the material risks of the proposed course of conduct

because he did not believe any existed. In that regard, it was the view of the majority of the hearing committee that Mr. Zamora mistakenly believed that his actions—putting the waiver language in his agreements, reviewing the agreements with clients to some degree, and having clients initial and sign each provision of the fee agreement—were sufficient to obtain informed consent under Rule 1.15(e). The majority concluded that Mr. Zamora was negligent because he had a "good-faith but incorrect" understanding of Rule 1.15(e)'s requirements, rather than a "conscious indifference" to the obligation of informed consent. The dissenting member of the hearing committee determined that Mr. Zamora acted recklessly because his misunderstanding of the requirements of informed consent—a "long standing" concept defined in the Rules of Professional Conduct—was not reasonable.

On review, the Board adopted the hearing committee's findings of fact and legal conclusions except for the conclusion that Mr. Zamora's misappropriation was negligent. The Board concluded that Mr. Zamora's testimony and the waiver he included in his fee agreements demonstrated that he was aware that he needed informed consent and did not obtain it. Regardless of his awareness of the specific disclosures required by *In re Mance*, it was not reasonable to be unaware of the general requirements of informed consent or the risks posed to clients by not using a trust account. Because "disbarment [is] . . . the only appropriate sanction" in cases

involving reckless misappropriation, the Board recommended that Mr. Zamora be disbarred. *See In re Addams*, 579 A.2d 190, 191 (D.C. 1990) (en banc).

## III.

Mr. Zamora contests only the Board's conclusion that he acted recklessly and its corresponding recommendation that he be disbarred. We accept the Board's factual findings if they are supported by substantial evidence in the record. D.C. Bar R. XI, § 9(h)(1). But we review de novo "ultimate facts," including whether Disciplinary Counsel has carried its burden to prove by clear and convincing evidence that an attorney's conduct was reckless. *See In re Haar*, 270 A.3d 286, 294 (D.C. 2022) (quoting *In re Micheel*, 610 A.2d 231, 234 (D.C. 1992)). We must adopt the Board's recommended disposition unless doing so "would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." *Id.* at 299 (quoting D.C. Bar R. XI, § 9(h)(1)).

Reckless misappropriation is marked by the attorney's "conscious indifference to the consequences of [their] behavior for the security of the funds." *In re Anderson*, 778 A.2d 330, 339 (D.C. 2001). Conscious indifference may be demonstrated by showing that an attorney made a "conscious choice of a course of

action" with either "knowledge of the danger to others" or "knowledge of facts that would disclose this danger to any reasonable person." *In re Ponds*, 279 A.3d at 362 (quoting *In re Gray* 224 A.3d 1222, 1232 (D.C. 2020)). Negligent misappropriation, on the other hand, is marked by a "good-faith but inadequate effort to comply" with Rule 1.15 or the requirements of *In re Mance*. *Id.* at 361. Our cases have emphasized that an attorney's good faith attempt to comply will not preclude a finding of recklessness if the attorney's errors or mistaken beliefs were objectively unreasonable. *See In re Gray*, 224 A.3d at 1232; *see also In re Ponds*, 279 A.3d at 362.

Disciplinary counsel does not dispute that Mr. Zamora was honestly mistaken, and argues only that Mr. Zamora's mistaken understanding of informed consent was not objectively reasonable. In assessing the contours of which mistakes are objectively reasonable in the flat-fee context, we are guided by two cases: *In re Haar* and *In re Ponds*.

In *Haar*, we concluded that Mr. Haar's failure to comply with Rule 1.15 was negligent because his ignorance of the rule's application to flat fees as clarified by *Mance* was reasonable. 270 A.3d at 298. In 2012, three years after the *Mance* decision, Mr. Haar deposited a large flat fee from a client into an operating account

rather than a trust account. *Id.* at 292. While this client's case was still pending, Mr. Haar became aware of *Mance*, and brought his accounting practices into compliance with that decision's requirements, but only prospectively. *Id.* The hearing committee found that Mr. Haar acted recklessly with regard to this pending case because his ignorance as to *Mance*'s application to pending cases was not reasonable. *Id.* at 293. But we found otherwise, in line with the Board: Mr. Haar's practice involved low fees and his clients' cases resolved quickly, leaving him with "little reason to consider *Mance*'s application to unearned flat fees." *Id.* at 297. We also noted that Rule 1.15(e)'s application to flat fees is not discernible from the text of the rule—it would be impossible to glean without knowledge of *Mance*—and that the rule "now imposes essentially the opposite restriction to that which it required when Mr. Haar began his career." *Id.* at 298. Ultimately, we concluded that "a practitioner who operated according to Mr. Haar's typical fee arrangements could reasonably fail to perceive" the dangers inherent in holding unearned flat fees in a personal bank account. *Id.*

In *Ponds*, on the other hand, we deemed reckless Mr. Ponds's failure to comply with the informed consent requirements of *Mance*. 279 A.3d at 361. Unlike Mr. Haar, Mr. Ponds was aware of the *Mance* decision. *Id.* at 360. Yet both Mr. Ponds's fee agreement and conduct were "fundamentally incompatible" with

the requirements of *Mance*: "[r]ather than making clear that the unearned portion of a flat fee must be returned, [his] fee agreement indicated precisely the opposite," and "[r]ather than complying with the requirement to return unearned advance fees, Mr. Ponds refused, despite an arbitral award requiring him to comply." *Id.* at 361. Mr. Pond's knowledge of the requirements of *Mance*, in conjunction with his blatantly noncompliant fee agreement and conduct, rendered his claim of a good-faith mistake "implausible." *Id.* at 362. But we declined to "rest . . . on a conclusion of subjective bad faith," concluding for many of the same reasons that Mr. Ponds's course of action was sufficient to demonstrate "conscious indifference" to the requirements of Rule 1.15(e) and *Mance* regardless of whether he was attempting to comply in good faith. *Id.* at 362.

Disciplinary Counsel urges us to view Mr. Zamora's conduct as in line with that in *Ponds* rather than *Haar*. Disciplinary Counsel points out that Mr. Zamora had reason to know of the risks posed to his clients. While he was not aware of the specific requirements laid out in *Mance*, the waiver provision in his fee agreement demonstrated that he at least knew he needed to obtain informed consent to his proposed arrangement. According to Disciplinary Counsel, while it may have been reasonable under the circumstances for Mr. Haar to be ignorant of *Mance*, it was not reasonable for Mr. Zamora to be ignorant of the requirements of informed consent

generally, namely the obligation to explain the material risks of a proposed course of conduct.

But Mr. Zamora was not entirely ignorant of the requirements of informed consent. His failure to explain the material risks of not using a trust account stemmed from his belief that his proposed course of conduct did not create material risks because "if there had been a request [for a refund], we would've come to a resolution . . . if fees were due . . . for any work that they disputed they would have received a refund of those fees." While this testimony reflects Mr. Zamora's disregard for other potential risks—namely that funds not held in a trust can be "spent, lost or exposed to a lawyer's creditors"—we do not view his overall impression of the material risks of his proposed arrangement as unreasonable.

Mr. Zamora's contention that he knew of his obligation to refund any unearned fees, and would have done so, is supported by his fee agreement. While Mr. Ponds's fee agreement erroneously described the flat fee as nonrefundable, *In re Ponds*, 279 A.3d at 359, Mr. Zamora's fee agreement alerted clients of their right to a refund of any unearned portion of the fee. And while Mr. Ponds refused to comply with an arbitration board order directing him to refund his client's entire fee, *id.* at 360, Mr. Zamora never received a refund request from Ms. Stiles prior to the

initiation of disciplinary proceedings.  It was not unreasonable for Mr. Zamora to conclude that the additional dangers posed by creditors or his own spending presented little risk to his clients based on his commitment to refunding them any unearned fee.

And Mr. Zamora's fee agreement satisfied many of the requirements laid out in *Mance*, despite his lack of familiarity with that case.  Of the five specific disclosures required by *Mance*, Mr. Zamora's fee agreement explicitly satisfied at least two of them: his fee agreement spelled out the terms of the benefit to be provided to his clients and informed them of the requirement that he refund unearned fees.  His fee agreement also conveyed two additional required disclosures in less exact terms: (1) that the fee would be held in escrow until earned unless an alternative agreement was reached, by requiring prospective clients to "WAIVE the requirement that the flat fee . . . be held in trust"; and (2) that Mr. Zamora could keep the fee only by providing the service for which the client contracted by noting that if the attorney does not "fail[] to perform the services contemplated . . . the fixed fee will be earned in full."  Mr. Zamora's fee agreements were not "fundamentally incompatible" with the requirements of informed consent, unlike Mr. Ponds's. *In re Ponds*, 279 A.3d at 361.

Ultimately, we conclude that Mr. Zamora's efforts to obtain informed consent—though obviously lacking—did not demonstrate "conscious indifference" to the security of his clients' funds or the purposes of informed consent. It was not objectively unreasonable for him to believe that the disclosures in his fee agreement were sufficient to obtain informed consent, particularly given his erroneous belief that his willingness to refund unearned fees mitigated any potential risks to his clients. Though this is a close case, Mr. Zamora's ignorance of the specific requirements of informed consent is more akin to Mr. Haar's ignorance of Rule 1.15(e)'s application to flat fees than to Mr. Ponds's plainly noncompliant fee agreement. Mr. Ponds was familiar with *Mance*, and presumably knew that *Mance* required him to refund all unearned fees, and yet his fee agreements stated the opposite; Mr. Zamora knew that he needed to obtain informed consent to his flat-fee arrangement under Rule 1.15(e), but made only some of the disclosures necessary to obtain it. These distinctions reflect the line between "conscious indifference"— recklessness—and negligence. We therefore agree with the hearing committee that Mr. Zamora misappropriated funds negligently.

## IV.

If we accept the Board's conclusions, we must adopt the Board's recommended disposition unless doing so "would foster a tendency toward

inconsistent dispositions for comparable conduct or would otherwise be unwarranted." *In re Haar*, 270 A.3d at 299 (quoting *In re Rodriguez-Quesada*, 122 A.3d 913, 920 (D.C. 2015)). But here, because the Board based its recommended punishment upon its finding of recklessness—a finding we reject—we look instead to the hearing committee's recommendation. "The purpose of imposing discipline is to serve the public and professional interests identified and to deter future and similar conduct rather than to punish the attorney." *In re Rodriguez-Quesada*, 122 A.3d at 921 (quoting *In re Kanu*, 5 A.3d 1, 16 (D.C. 2010)). The hearing committee's reasoning adhered to these principles.

After noting that "a six-month suspension without a fitness requirement is the norm for attorneys who have committed negligent misappropriation," *In re Edwards*, 870 A.2d 90, 94 (D.C. 2005), the hearing committee examined the range of punishments typically levied for violations of Rule 1.3(a) and Rule 1.16(d) and determined that additional one-month sanctions for each of those violations would be appropriate. Finally, the hearing committee determined that Mr. Zamora owed Ms. Stiles and Mr. Ascensio $750 and added restitution in that amount to the baseline punishment—establishing a baseline punishment of eight months suspension and $750 restitution.

The hearing committee then carefully considered the requisite factors to determine if a departure from this presumptive sanction was warranted. These factors include: "(1) the seriousness of the conduct, (2) prejudice to the client, (3) whether the conduct involved dishonesty, (4) violation of other disciplinary rules, (5) the attorney's disciplinary history, (6) whether the attorney has acknowledged his or her wrongful conduct, and (7) mitigating circumstances." *In re Martin*, 67 A.3d 1032, 1053 (D.C. 2013). In considering these factors, the hearing committee placed particular emphasis on Mr. Zamora's lack of any prior disciplinary history spanning his ten-year career as a federal immigration practitioner with high case turnover, the generally underserved population his practice serves, and the difficulties faced by solo practitioners who maintain high volume practices. The hearing committee ultimately found the mitigating factors (lack of prior disciplinary history, lack of dishonesty, and the additional mitigating circumstances noted above) to carry equal weight to the aggravating circumstances (seriousness of misconduct and prejudice to client), and left the recommended sanction largely unchanged, merely adding the requirement that Mr. Zamora attend a continuing legal education program regarding flat-fee billing practices.

Because we agree with the hearing committee's careful analysis, we suspend Mr. Zamora for eight months for negligent misappropriation and order him to pay

$750 plus interest in restitution and attend a continuing legal education program regarding flat-fee billing practices.

*So ordered.*