**In re Samuel BAILEY, Jr., Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 384974).**

**No. 03–BG–171.**

District of Columbia Court of Appeals.

Argued April 8, 2004.

Decided Sept. 15, 2005.

Karl W. Carter, for respondent.

Elizabeth J. Branda, Executive Attorney, for the Board on Professional Responsibility.

Traci M. Tait, Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel at the time the brief was filed, was on the brief, for the Office of Bar Counsel.

Before SCHWELB and REID, Associate Judges and FERREN, Senior Judge.

REID, Associate Judge:

A majority of the Board on Professional Responsibility ("the Board") has recommended that Samuel Bailey, Jr. be suspended from the practice of law for nine months and be required to complete a course in ethics and a course in trust accounting as a condition of reinstatement, due to his violation of the District of Columbia Rules of Professional Responsibility. The Board found that Mr. Bailey had commingled funds,[1] failed to maintain complete trust account records,[2] failed to notify a physician of a client's settlement,[3] and entered into an impermissible business

---

1. Rule 1.15(a).

2. Rule 1.15(a).

3. Rule 1.15(b).

transaction with a client.[4] The Board majority rejected the hearing committee's finding of misappropriation.[5] Because the hearing committee automatically recommended disbarment[6] after having found that Mr. Bailey engaged in misappropriation, the Board conducted its own sanctions analysis and concluded that a nine-month suspension was appropriate. Bar Counsel and Mr. Bailey noted exceptions to the Board's report and recommendation.

Bar Counsel contends that the Board erred when it rejected the hearing committee's finding of misappropriation. Specifically, Bar Counsel asserts that the authorization gave Dr. Franklin Garmon an interest in the settlement funds thus obligating Mr. Bailey to "safeguard and promptly pay funds belonging to [Dr. Garmon]." Therefore, when Mr. Bailey "failed to honor Dr. Garmon's [a]uthorization, and instead spent the doctor's share on [his] personal and business expenses without Dr. Garmon's authority, he engaged in misappropriation in violation of Rule 1.15(a). His failure to notify or promptly pay Dr. Garmon, constituted a violation of Rule 1.15(b)." Bar Counsel notes exception to the recommended nine-month suspension, insisting that disbarment is warranted. Mr. Bailey contends that the authorization did not give Dr. Garmon a property interest in the settlement funds,[7] and therefore the Board did not err when it found no misappropriation. Mr. Bailey, however, disagrees with the Board's recommended sanction and argues that because he made an "honest mistake"

he should only be given a six-month suspension.

## FACTUAL SUMMARY

The record before us, which includes the findings of the hearing committee, shows that Mr. Bailey[8] represented Almaz Haile, an immigrant from Eritrea.[9] Ms. Haile sustained an injury in 1989, at a Giant Food store, when she slipped and fell. She retained Mr. Bailey, then a member of Lee & Harvey, to represent her in a personal injury action.[10]

In the course of his representation, Mr. Bailey referred Ms. Haile to Dr. Garmon, who treated her injuries. On June 19, 1989, an "[a]uthorization" form provided by Dr. Garmon to Ms. Haile and Mr. Bailey was executed. The section of the "[a]uthorization" under which Ms. Haile's signature appears, provided in pertinent part:

> I hereby authorize and direct you, my attorney, to pay directly to said doctor such sums as may be due and owed to him for medical services rendered to me, my son, or daughter, and any other bills that are due his office which shall include fees for his appearance in court on my behalf (including those accrued after he has been placed on alert for purposes of court appearance, whether or not he actually makes that appearance).
>
> If required as an expert witness, whether he testifies or not for reports made or depositions given in this matter, I fur-

---

4. Rule 1.8(a).

5. Five Board members concluded that Mr. Bailey did not misappropriate funds belonging to Dr. Garmon while four Board members disagreed. *See* Rule 1.15(a).

6. *In re Addams*, 579 A.2d 190, 194–98 (D.C. 1990) (en banc).

7. Rule 1.15(b)

8. Mr. Bailey was admitted to the District of Columbia Bar on December 18, 1994.

9. Ms. Haile's first name also appears in the record as "Almas."

10. Mr. Bailey subsequently left Lee & Harvey but continued to represent Ms. Haile.

ther authorize you my attorney, to withhold such sums from any settlements, judgments or verdicts as may be necessary to adequately protect said doctor and compensate him for his time and efforts on my behalf and also to institute a lien on this case to the said doctor against any and all proceeds for me, my son or daughter until the said doctor's medical bills for treatment of me, my son or daughter, fees for court appearance(s) (or time awaiting that appearance), deposition(s) are paid or he is compensated for his efforts on behalf of me, my son or daughter in connection herewith.

I fully understand that I am directly responsible to said doctor for all medical bills submitted by him for services rendered and that this agreement is made solely for said doctor's additional protection. I fully understand that such payments are not contingent on any settlement, judgment or verdict form which I eventually recover damages, compensation or said fee.

The section signed by Mr. Bailey read as follows: "The undersigned, being attorney of record for the above patient/client does hereby agree to observe all the terms of the above and agrees to withhold such sums from any settlement(s), judgment(s) or verdicts due said patient/client as may be necessary to adequately protect said doctor."

On September 27, 1991, Mr. Bailey deposited a $25,000 settlement check from Giant Foods' insurance company into an account with City National Bank under the name "Samuel Bailey Jr Atty at Law Client Trust Account" ("Trust Account"). Prior to the deposit of that check, the account had a balance of $931.38.

A settlement disbursement sheet, dated September 26, 1991, was signed by Ms. Haile and Mr. Bailey. It stated, "[p]ursuant to your instruction, [w]e have settled your personal injury claim of March 28, 1989, and the following constitutes all fees and charges. Further, your authorization has been given for my office to borrow the funds awarded to use as deemed appropriate." The disbursement sheet showed that Ms. Haile was owed $9,122.13.[11] The disbursement sheet also revealed that the total cost of Ms. Haile's medical expenses was $5,425.86, which included $2,420.30 owed to Dr. Garmon. The final paragraph of the settlement disbursement sheet specified: "I, Almaz Haile, have read the above disbursement and agree with all payments."

In addition, a promissory note was executed by Mr. Bailey on September 26, 1991. It provided as follows:

For value received, the undersigned [Mr. Bailey] promises to pay to Almas Haile, the sum of $5,425.86, the amount of medical expenses in her case, with interest at a rate of 5% per annum, or to pay outstanding medical expenses directly to medical providers listed on the settlement sheet after satisfactory negotiations.

If [Mr. Bailey] is able to negotiate a discounted payment to any of the listed medical expenses, such discount will be paid to Almas Haile. All monies owed to Ms. Haile under this agreement must be paid within a four year period from the date of this note.

Ms. Haile testified that "she reviewed the note with Mr. Bailey, but she nevertheless expected that the doctors were 'going to be paid' and that Mr. Bailey 'was going to

11. This settlement figure represents the $25,000 settlement reward, less Mr. Bailey's attorney's fee ($10,000), his out of pocket costs ($452.00), and the medical expenses ($5,425.86).

take care of it.' Though she did not have a specific notion of when he would do so." Mr. Bailey did not inform Dr. Garmon or any of the other medical providers about this agreement.

Mr. Bailey testified that he prepared and executed the promissory note and reviewed the terms with Ms. Haile. Although English was not Ms. Haile's first language, Mr. Bailey testified that they "were able to communicate," and that he thought "she understood." [12] Mr. Bailey did not advise Ms. Haile to consult legal counsel regarding the loan, nor did he provide Ms. Haile with the prevailing interest rate. An expert for Bar Counsel testified that if Mr. Bailey had received a loan from a bank, the interest rate would have been higher than what was provided in the promissory note. However, the expert "did not establish that Ms. Haile could have earned more by investing or lending her money elsewhere."

Mr. Bailey never notified Dr. Garmon of the settlement. Instead, Dr. Garmon learned of the settlement when he encountered Ms. Haile months later. Thereafter, Dr. Garmon made several phone calls to Mr. Bailey's office inquiring about his payment. After Mr. Bailey failed to respond, Dr. Garmon wrote him a letter on August 19, 1992, in which he demanded payment and threatened legal action if payment was not received. On September 2, 1992, Dr. Garmon filed a complaint with Bar Counsel. Mr. Bailey eventually paid Dr. Garmon $2,420.30 on October 23, 1992, more than one year after the case had been settled.[13]

During the period between September 1991 and November 1992, Mr. Bailey made several telephone transfers and cash withdrawals from his client Trust Account; however, he lacked the records to explain them. He also deposited several checks into the Trust Account reflecting payments for "legal fee[s]" or "attorney fees," $10,000 borrowed from his mother, fee advances, and entrusted client funds. By August 18, 1992, the Trust Account had a balance of 0.11 cents according to account analysis.

Bar Counsel filed the specification of charges against Mr. Bailey on November 2, 1998. The specification alleged that:

> [Mr. Bailey's] conduct violated the following provisions of the Rules of Professional Conduct:
>
> (A) Rule 1.15(a), in that [he] (i) intentionally and/or recklessly misappropriated funds belonging to his client and/or one or more third person; and/or failed to hold property of a client and/or third persons in his possession in connection with a representation separate from his own property (commingling);
>
> (B) Rule 1.15(a), in that [he] failed to maintain complete trust account records;
>
> (C) Rule 1.15(b), in that [he] failed to notify and/or pay promptly one or more third persons having an interest in funds entrusted to [him] in the course of a legal representation;
>
> (D) Rule 1.8(a), in that [he] entered into a business transaction with a client and/or knowingly acquired an owner-

---

12. The hearing committee observed that during the hearing, approximately eight years after the events, it appeared that Ms. Haile "had difficulty fully comprehending spoken English."

13. On January 29, 1993, Mr. Bailey paid the Pain and Therapy Group $145.00. Neurodiagnostic was owed $1,400.00 but Mr. Bailey

only paid $1,228.00 on January 29, 1993. Mr. Bailey paid The Associates Columbia Hospital $787.86 on February 9, 1993 and paid the remaining balance of $618.00 on February 11, 1993. There was no evidence that HealthTech, one of Ms. Haile's other medical providers, was ever paid.

ship, possessory, security, and/or other pecuniary interest adverse to the client without providing the client a writing that fully disclosed the transaction's terms; and

(E) Rule 1.8(b), in that [he] prepared an instrument giving him a substantial gift from the client.

A hearing committee heard two days of testimony in July 1999, during which Bar Counsel presented testimony by Dr. Garmon, Robert H. Tapscott, Jr., a fraud investigator for Crestar Bank which acquired City National Bank, and Lateef Bassi, a certified public accountant. The committee also considered documentary evidence. Mr. Bailey testified on his own behalf, and also called as witnesses Ms. Haile, and David B. Torchinsky, a certified public accountant. On June 7, 2001, the hearing committee issued a report finding that Mr. Bailey violated: Rule 1.15(a) based on commingling, misappropriation, and failure to maintain complete Trust Account records; Rule 1.15(b) due to his failure to notify and pay promptly third persons; and Rule 1.8(a) because of his impermissible business transaction with Ms. Haile. The hearing committee did not find that Mr. Bailey violated Rule 1.8(b), preparing an instrument giving himself a substantial gift from his client, Ms. Haile. The hearing committee recommended that Mr. Bailey be disbarred.

Bar Counsel did not file an exception to the hearing committee's report and recommendation. Mr. Bailey claims that he filed an exception to the hearing committee's report and recommendation on June 21, 2001, however, there appears to be no record of the filing with the Board. On January 22, 2001, to assist the Board in its review of the matter, the Board ordered the parties to brief the following issues:

(1) What constitutes "property" of clients or third parties within the meaning of Rule 1.15(a);

(2) Whether the [a]uthorization form (or any other act or instrument) in the record of this case effected an "assignment" of the settlement funds to Dr. Garmon or otherwise conveyed a sufficient "property" interest to him to come within Rule 1.15(a);

(3) Whether any such "property" interest of Dr. Garmon was sufficiently clear and well established that the use of the funds should not be considered a good faith, negligent mistake of fact or law in view of the Hearing Committee's conclusion that [Ms. Hailed] authorized [Mr. Bailey] to borrow funds; and

(4) Whether, in view of the issues identified above, the presumption of disbarments for in *In re Addams,* 579 A.2d 190 (D.C.1990) (*en banc*), is applicable here.

On February 27, 2003, the Board issued its report and recommendation. It adopted the hearing committee's findings of fact with some modifications. The Board found that Mr. Bailey commingled entrusted funds by using, "as his own, funds that he kept in his trust account with clients' entrusted funds." However, the Board rejected the committee's finding of misappropriation under Rule 1.15(a). As the Board stated:

Misappropriation is an extremely serious ethical violation, with extremely serious consequences. Where, as here, a contract prepared by a third-party service provider is relied upon to support the charge, the language creating the assignment or lien must be clear—particularly where, as here, the charge requires clear and convincing evidence to be sustained. *See In re Anderson,* 778 A.2d 330, 335 (D.C.2001).

We do not find that level of clarity in this case. The [a]uthorization, as writ-

ten, created neither a lien against the settlement proceeds nor an outright assignment of them to Dr. Garmon. First, there is no language in the [a]uthorization suggesting an assignment of the Funds to Dr. Garmon. Second, the provisions containing lien language relate only to fees for the Doctor's services as an expert witness, and the fees in question were not for those services. Hence, the Funds were Ms. Haile's to lend, and Dr. Garmon's remedies were those of a general creditor. It follows that the Funds were not the "property" of Dr. Garmon, and therefore that the Respondent did not commit misappropriation when he borrowed them from his client.

Furthermore, although the Board found that Mr. Bailey failed to promptly notify Dr. Garmon of Ms. Haile's settlement, which amounted to a violation of Rule 1.15(b), it did not conclude that Mr. Bailey violated the first sentence of Rule 1.15(b), "that 'a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive,'" because Dr. Garmon did not have a "sufficient interest" in the settlement and therefore was not "entitled to receive" funds from the settlement. Mr. Bailey's failure to notify was based on Ms. Haile's intention that Dr. Garmon be paid for the medical services he provided. The Board also found that Mr. Bailey violated Rule 1.8(a) by failing to give Ms. Haile a reasonable opportunity to seek the advice of independent counsel. Neither the hearing committee nor the Board found a violation of Rule 1.8(b).

The Board "could not find [that] the transaction [was] unfair or unreasonable to Ms. Haile. . . ." After determining that there was no misappropriation and in light of *In re Hutchinson,* 534 A.2d 919, 924 (D.C. 1987) (en banc), the Board recommended that Mr. Bailey "be suspended from the practice of law for nine months, without requirement to show fitness, but with a requirement to complete a course in ethics and a course in trust accounting (at least three hours each) as a condition of reinstatement." Bar Counsel took exception to the Board's finding of no misappropriation and both Bar Counsel and Mr. Bailey took exception to the Board's recommended sanction.

## ANALYSIS

Bar Counsel challenges the findings and conclusion of the Board majority that the authorization did not constitute a lien on Ms. Haile's settlement funds.[14] In particular, Bar Counsel contends that in finding that Mr. Bailey did not misappropriate funds "[t]he Board majority hinge[d] its erroneous legal conclusion on its equally erroneous finding that Dr. Garmon had not rendered services as an expert," thereby concluding that "the authorization did not establish a lien on the Funds." In Bar Counsel's view, "Dr. Garmon's [a]uthorization created legal rights in his favor, including interests, property, an assignment, and a lien, obligating [Mr. Bailey] to safeguard and promptly pay funds belonging to the doctor." Bar Counsel insists that

14. We respectfully disagree with the following assertion of our concurring colleague: "[M]uch that the court has written is dictum addressing two questions the resolution of which, in the final analysis, can have no effect on the outcome of the case." Our task, as argued by all parties, is to examine whether an "authorization," presented to Mr. Bailey and his client by Dr. Garmon, created a lien on Ms. Haile's settlement funds in behalf of the doctor, and if so, whether Mr. Bailey engaged in misappropriation with respect to the sum due Dr. Garmon. Our analysis of that authorization would be incomplete, make little sense, and leave the parties in doubt without an examination of the entire authorization and the precise questions presented to this court on appeal.

"[n]ot only did Dr. Garmon's [a]uthorization give him an interest as a matter of law—irrespective of his services as an expert—but Dr. Garmon, in fact served as an expert in [Ms. Haile's] case." Therefore, Bar Counsel argues that Mr. Bailey violated Rule 1.15(a) when he spent $2,420.30 of the settlement owed to Dr. Garmon for his services characterized as a misappropriation, despite the fact that Ms. Haile authorized Mr. Bailey to borrow the full settlement amount of $25,000. Bar Counsel also asserts that Mr. Bailey violated Rule 1.15(b) when he failed to notify Dr. Garmon of the settlement or promptly pay him. Finally, Bar Counsel maintains that because Mr. Bailey's misappropriation went beyond mere negligence, disbarment is the appropriate sanction in light of *In re Addams, supra,* 579 A.2d at 194.

In defending its report and recommendation, the Board insists that the authorization is neither an assignment nor a lien, and thus, did not convey an interest to Dr. Garmon. Specifically, the Board maintains that the word "property" as used in Rule 1.15(a) requires that there be a "just claim" or "perfected interest that runs to the specific piece of property." The Board asserts that after interpreting the plain language of the authorization it is apparent that Dr. Garmon simply retained the right to be paid by Ms. Haile as a "general debt obligation" because the authorization did not specifically state that the settlement funds were to be the source of the payment. The plain language in the authorization, referred to Dr. Garmon's services as an expert witness, not to his treatment of Ms. Haile. The Board argues that Dr.

Garmon only provided Ms. Haile with medical services, *i.e.,* "the diagnosis and treatment of Ms. Haile's injuries." Therefore, Dr. Garmon "did not have a lien against the settlement under the [a]uthorization."

Essentially, the Board contends that there was no misappropriation because the settlement funds belonged to Ms. Haile and she gave Mr. Bailey permission to borrow the funds.[15] That is, Mr. Bailey "did not commit misappropriation," because Dr. Garmon did not have a property interest in the settlement funds under Rule 1.15(a). Furthermore, the Board maintains that Mr. Bailey failed to promptly notify Dr. Garmon of the settlement, but he did not violate the requirement that he promptly pay Dr. Garmon.[16] Finally, the Board defends its recommendation that Mr. Bailey be suspended for nine months, asserting that it carefully considered the seriousness of the offenses, the "ongoing and intentional nature of the violations," and case law showing that "the sanction in this case should fall between the one-year suspension in [*In re*] *Arneja*[17] and the [thirty]-day suspension in [*In re*] *Ross.*[18]"

In support of the Board's decision, Mr. Bailey argues that the record does not substantiate a finding that Dr. Garmon acted as an expert witness or had an interest in the settlement funds. He asserts that the authorization did not convey a property interest to Dr. Garmon because there was no reference to either a lien or assignment that would indicate that he held an interest in the settlement funds. Therefore, the Board's finding of no mis-

---

**15.** The Board notes that if we were to find "that the [a]uthorization conveyed property interest to Dr. Garmon under Rule 1.15(a), the Board majority would find the misappropriation arose from a negligent mistake of law concerning the legal effect of the [a]uthorization."

**16.** *See* Rule 1.15(b).

**17.** 790 A.2d 552 (D.C.2002).

**18.** 658 A.2d 209 (D.C.1995).

appropriation was not error. However, Mr. Bailey does take exception to the Board's recommended sanction. He insists that because the Board did not find intentional or reckless misappropriation, and because he made "an honest mistake," a six-month suspension is more appropriate.

### Standard of Review

"The scope of our review of the Board's Report and Recommendation is limited." *In re Berryman*, 764 A.2d 760, 766 (D.C.2000) (quoting *In re Ray*, 675 A.2d 1381, 1385 (D.C.1996)). We are obligated both to "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and [to] adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." *In re Carlson*, 802 A.2d 341, 347 (D.C.2002) (quoting *In re Berryman*, *supra*, 764 A.2d at 766) (quotation marks omitted) (citation omitted). In the same vein, "the Board is obligated to accept the hearing committee's factual findings if those findings are supported by substantial evidence in the record, viewed as a whole." *Id.* (citing *In re Micheel*, 610 A.2d 231, 234 (D.C.1992) (other citation omitted)). "However, while the Board must defer to the subsidiary findings of basic facts, which include such things as credibility determinations, made by the [Board's] fact-finding body (the hearing committee)[,] .... the Board owes no deference to the hearing committee's determination of ultimate facts which are really conclusions of law." *Id.* (quotation marks and citations omitted). Therefore, we review *de novo* the question as to "[w]hether [the] underlying circumstances constitute misappropriation and whether any misappropriation resulted from more than simple negligence ...." *In re Berryman*, *supra*, 764 A.2d at 766 (quoting *In re*

*Utley*, 698 A.2d 446, 449 (D.C.1997) (other citation omitted)).

### Rule 1.15(a) and (b): Misappropriation

In order to determine whether Mr. Bailey engaged in misappropriation in this case, we turn first to (1) Bar Counsel's central argument that "Dr. Garmon's [a]uthorization created legal rights in his favor, including interests, property, an assignment, and a lien, obligating [Mr. Bailey] to safeguard and promptly pay funds belonging to the doctor," and (2) the Board's opposing argument that Dr. Garmon did not have a "property interest" within the meaning of Rule 1.15(a) because the authorization constituted neither an assignment nor lien. Resolution of these arguments begins with Rule 1.15(a) and (b) of the District of Columbia Rules of Professional Conduct which provide:

> (a) A lawyer shall hold property of clients or third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in a financial institution which is authorized by federal, District of Columbia, or state law to do business in the jurisdiction where the account is maintained and which is a member of the Federal Deposit Insurance Corporation, or the Federal Savings and Loan Insurance Corporation, or successor agencies. Other property shall be identified as such and appropriately safeguarded; provided, however, that funds need not be held in an account in a financial institution if such funds (1) are permitted to be held elsewhere or in a different manner by law or court order, or (2) are held by a lawyer under an escrow or similar agreement in connection with a commercial transaction. Complete records of

such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property, subject to Rule 1.6.

Subsections (a) and (b) of Rule 1.15 use the terms or phrases: "property of clients or third persons," "funds or other property in which a client or third person has an interest," and "funds or other property that the client or third person is entitled to receive." The word "property" as used in these subsections is not defined. The Restatement of the Law of Property, however, uses the word "property" "to denote legal relations between persons with respect to a thing."[19] RESTATEMENT OF THE LAW OF PROPERTY, Introductory Note (1936). "Legal relations between persons can be of widely differing types," and those relations may be explained, in part, by using the word "right." *Id.* The restatement defines "right" as "a legally enforceable claim of one person against another, that the other shall do a given act or shall not do a given act."[20] RESTATEMENT, § 1. This interpretation of "right" is embodied in Rule 1.15, as evidence by Comment [4] to the rule:

Third parties, such as client's creditors, may have *just claims* against funds or other property in a lawyer's custody. A lawyer may have a duty under applicable law to protect such third-party claims against wrongful interference by the client, and accordingly may refuse to surrender the property to the client. However, a lawyer should not unilaterally assume to arbitrate a dispute between the client and the third party.

Rule 1.15, Comment [4] (1998) (emphasis added). And the concepts of (1) a "claim," reflected in the definition of "right" found in the Restatement, and (2) "just claim" as used in Comment [4] of the rule 1.15 are central to the analysis of D.C. Legal Ethics Opinion No. 293, "Disposition of Property of Clients and Others Where Ownership is in Dispute" (adopted July 20, 1999, revised Nov. 16, 1999), on which the Board relies. Opinion No. 293 is instructive because it examines third party claims, and "just claims": in a third party context. The opinion differentiates the "claims of a client" from "third party claims":

Unlike the claims of a client, which need not be justified even superficially in order to bar the lawyer from making a distribution, *In re Haar*, 667 A.2d [1350,] 1353 [D.C.1995], the claims of the third party must rise to a higher level.

---

19. The Restatement's approach to "property" is derived from the classic analysis of Wesley Newcomb Hohfeld who "sought to describe four differentiable types of relationship[s] by his four pairs of jural correlatives, right-duty, privilege-right, power-liability, and immunity-disability." RICHARD R. POWELL, POWELL ON REAL PROPERTY vol. 1 § 5.02 at 5–3 (2005). *See also* ROGER A. CUNNINGHAM, ET AL., THE LAW OF PROPERTY, 2d. ed., at 3 (footnote omitted). For our purposes here we focus primarily on the concept "right."

20. Although the word "interest" appears in Rule 1.15(b), it is embraced within the concept "right." *See* RESTATEMENT, § 5 ("The word 'interest' is used in this Restatement both generically to include varying aggregates of rights, privilege, powers and immunities and distributively to mean any one of them.").

The third party must have a "just claim" as to which "applicable law" imposes a duty on the lawyer to distribute the funds to the third party or withhold distribution.

*Id.* at 164 (citing D.C. R. Prof. Conduct 1.15, Comment [4]). "In general, a 'just claim' that the lawyer must honor pursuant to Rule 1.15 is one that relates to the particular funds in the lawyer's possession, as opposed to merely being (or alleged to be) a general unsecured obligation of the client." *Id.* at 165. Examples of "just claims" include: (1) "an attachment or garnishment arising out of a money judgment against the client"; (2) "a statutory lien"; (3) "a court order relating to the specific funds in the lawyer's possession"; and (4) "a contractual agreement." *Id.* With respect to the fourth example, the reference is to "a contractual agreement made by the client and joined in or ratified by the lawyer to pay certain funds in the possession of the lawyer ... to a third party ...." *Id.* This "type of agreement ... is commonly known as an 'Authorization and Assignment.' " *Id.*

In the case before us, Dr. Garmon sent his own authorization form to Mr. Bailey and Ms. Haile for execution. His form is entitled, "Authorization for Release of Medical Records and Payment of Medical Expense." The question we confront is whether this authorization which does not mention the word "assignment," conveyed a property interest to Dr. Garmon in the settlement funds sent to Mr. Bailey.[21] The hearing committee concluded that "a reasonable person in the position of the parties" would have understood that the authorization constituted an assignment of the settlement funds to Dr. Garmon. The Board disagreed, explaining that not only was the authorization not titled "assignment," but there was no language in the document that plainly stated or suggested that there was an assignment. Furthermore, the Board determined that the authorization did not create a lien as suggested by Bar Counsel, because the "lien" language in the authorization only referred to Dr. Garmon's services as an expert witness. Mr. Bailey agrees, maintaining that the authorization did not give Dr. Garmon a property interest in the settlement funds because it made no reference to a lien or assignment, except as it relates to Dr. Garmon's services as an expert witness. Instead, Mr. Bailey asserts that Dr. Garmon was merely a general creditor. On the other had, Bar Counsel argues that the plain language of the authorization created an interest in Ms. Haile's settlement proceeds even though it was not specifically labeled as an "authorization and assignment." Bar Counsel insists that the authorization "created legal rights in Dr.

21. Dr. Garmon's form is quite different from that apparently sent to Dr. Frank B. Watkins, one of Ms. Haile's other doctors. The form, styled "Authorization and Assignment," was "adopted ... by the Interprofessional Committee of the Bar Association of Montgomery County and the Montgomery County Medical Society." It was "also approved by the Executive Committee of both Associations." In signing this form, Ms. Haile "irrevocably assign[ed]" to Dr. Watkins, and "authorize[d] and direct[ed]" Mr. Bailey "to pay from the proceeds of any recovery in [her] case all reasonable fees for services provided by [Dr. Watkins], including fees for preparation and testimony, as a result of [her] injury ...." She also acknowledged her "personal primary obligation to pay ..." Dr. Watkins. Mr. Bailey also signed the form and "agree[d] to comply fully with the foregoing Authorization and Assignment." He further "agree[d] to advise [Dr. Watkins] in writing the status of the claim of [Ms. Haile] within ten (10) days of the request."

Before signing and having their clients sign authorization forms provided by a third party, members of the D.C. Bar should examine those forms to determine whether they are properly and adequately drafted.

Garmon's favor, including interests, property, an assignment, and a lien, obligating [Mr. Bailey] to safeguard and promptly pay funds belonging to [Dr. Garmon]," and that the payment would derive from any funds, settlement or otherwise. In addition, Bar Counsel argues that Dr. Garmon did serve as an expert witness for Ms. Haile.

In analyzing the terms of the authorization we turn to our rules of contract interpretation. "In order to determine whether a contract provision has more than one reasonable interpretation, it is necessary to look at the 'face of the language itself, giving the language its plain meaning, without reference to any rules of construction.'" *Capital City Mortgage Corp. v. Habana Vill. Art & Folklore, Inc.*, 747 A.2d 564, 567 (D.C. 2000) (quoting *Sacks v. Rothberg*, 569 A.2d 150, 154 (D.C.1990)) (other citation omitted). "If the court finds that the contract has more than one reasonable interpretation and therefore is ambiguous, then the court—after admitting probative extrinsic evidence—must 'determine what a reasonable person in the position of the parties would have thought the disputed language meant.'" *Id.* (quoting *Intercounty Constr. Corp. v. District of Columbia*, 443 A.2d 29, 33 (D.C.1982)) (internal citation omitted). "Extrinsic evidence may include 'the circumstances before and contemporaneous with the making of the contract, all usages—habitual and customary practices—which either party knows or has reason to know, the circumstances surrounding the transaction and the course of conduct of the parties under the contract.'" *Id.* at 568 n. 2. "Only if, after applying the rules of contract interpretation, the terms still are not subject to 'one definite meaning,' will the ambiguities be 'construed strongly against the drafter.'" *Id.* (quoting *1901 Wyoming Ave. Coop. Ass'n v. Lee*, 345

A.2d 456, 463 (D.C.1975)). The determination of ambiguity is a question of law which this court reviews *de novo*. *Id.* at 568.

An examination of the authorization shows that none of the provisions at issue here are ambiguous, although the agreement is poorly drafted. *See Washington Props., Inc. v. Chin, Inc.*, 760 A.2d 546, 548 (D.C.2000) ("A contract is not ambiguous merely because the parties dispute its meaning, nor is it ambiguous merely because its terms are complex or 'could have been clearer.'") First, the authorization states that, "I [Ms. Haile] authorize and direct you, my attorney [Mr. Bailey], to pay directly to said doctor [Dr. Garmon] such sums as may be due and owed to him for medical services rendered to me, my son, or daughter, and any other bills that are due this office which shall include fees for his appearance in court on my behalf (including those accrued after he has been placed on alert for purposes of court appearance, whether or not he actually makes that appearance)." There is nothing in this language that suggests that Dr. Garmon has a lien or was assigned an interest in the settlement funds with respect to his general treatment and diagnosis of Ms. Haile. It simply establishes that Mr. Bailey is directed to pay for the *medical services* provided to Ms. Haile by Dr. Garmon, that is, services for the diagnosis and treatment of her injuries, as well as fees for his appearance in court. This language does not specifically refer to the settlement funds as the source of payment. Thus, the plain meaning of this provision does not convey an interest in the settlement payments to Dr. Garmon, for medical services to Ms. Haile.

The next paragraph of the authorization states that,

> If required as an expert witness, whether he testifies or not for reports made or depositions given in this matter, I [Ms.

Haile] further authorize you, my attorney [Mr. Bailey], to withhold such sums from any settlements, judgments or verdicts as may be necessary to adequately protect said doctor and compensate him for his time and efforts on my behalf and also to institute a lien on this case to the said doctor against any and all proceeds for me, my son or daughter until the said doctor's medical bills for treatment of me, my son or daughter, fees for court appearance(s) (or time awaiting that appearance), deposition(s) are paid or he is compensated for his efforts on behalf of me, my son or daughter in connection herewith.

This paragraph clearly created a lien on the settlement funds in favor of Dr. Garmon. However, under its plain language, and as the Board argues, this paragraph is restricted to Dr. Garmon's services as an expert witness. This paragraph of the authorization did not describe Dr. Garmon's service as Ms. Haile's expert witness in terms of an "appearance in court." Rather, it covered "fees for court appearance(s) (or time awaiting that appearance)," "reports made or depositions given," as well as "medical bills for treatment."

■ As we have indicated, the authorization is poorly drafted. Thus, it may seem strange that the first two paragraphs of the authorization restrict payment to Dr. Garmon from the settlement funds to the situation in which he is "required as an expert witness." Nevertheless, that is the plain meaning of the first two paragraphs of the authorization. The record shows that Dr. Garmon did not testify on behalf of Ms. Haile at any point during her personal injury case.[22] At any rate, the parties disagree as to whether Dr. Garmon

was an expert witness. The Board, without referring to any specific evidence, found that Dr. Garmon was not an expert witness. Mr. Bailey agreed pointing to the Board's report and recommendation which labeled Dr. Garmon as Ms. Haile's treating physician. In addition, Mr. Bailey notes that Dr. Garmon never referred to himself as an expert witness but simply as Ms. Haile's treating physician. Bar Counsel, on the other hand, argues that Dr. Garmon was an expert witness as evidenced by Mr. Bailey's responses during discovery, naming Dr. Garmon as one of his experts. In addition, Bar Counsel points to at least two reports prepared by Dr. Garmon.

Given our deference to the Board, we conclude that there is substantial evidence in the record to support the finding that Dr. Garmon was not an expert witness. Dr. Garmon sent Mr. Bailey a letter dated August 29, 1991, which was a continuation of a medical report dated March 23, 1990. In the letter Dr. Garmon described his diagnosis of Ms. Haile's injuries. The last page of the letter was a bill that broke down the "fees for services rendered." The total was $3,037.81. Scribbled at the bottom of the bill was the phrase "agreed to $2,430.25," and the date September 26, 1991. The breakdown of the charges only referred to general medical services for diagnosis and treatment of Ms. Haile's injuries. In addition, in a letter dated August 19, 1992, Dr. Garmon wrote that he had not been "compensated [$2,420.30] for [his] *services in treating* [Ms. Haile] ...." (Emphasis added.) The reports prepared by Dr. Garmon were for the diagnosis and treatment of Ms. Haile, not for Dr. Garmon's services as Ms. Haile's expert wit-

---

**22.** According to a footnote provided in Bar Counsel's brief, Dr. Garmon was put on notice twice to be deposed, but the record is unclear as to whether he was actually deposed.

ness.[23] Therefore, because Dr. Garmon's services were not as an expert witness but as Ms. Haile's treating physician, the first two paragraphs of the authorization did not convey a lien in Dr. Garmon's favor.

▪ The paragraph in the authorization that is most significant with respect to Dr. Garmon's right to be paid from the settlement funds is that above Mr. Bailey's signature which states: "The undersigned, being attorney of record for the above patient/client [Ms. Haile] does hereby agree to observe all the terms of the above and agrees to withhold such sums from any settlement(s), judgment(s) or verdicts due said patient/client as may be necessary to adequately protect said doctor." A reasonable person in the position of the parties would interpret this clause as holding Mr. Bailey, the person to whom Ms. Haile's settlement funds were sent, accountable for any monies owed to Dr. Gar-

mon; either as Ms. Haile's expert witness or as her treating physician. This last paragraph of the authorization clearly stated that Mr. Bailey agreed to withhold such monies owed to Dr. Garmon for his services from any settlements due to Ms. Haile as may be necessary to "adequately protect" Dr. Garmon. Therefore, when Ms. Haile's case settled for $25,000, Mr. Bailey was under a *contractual* obligation to withhold the $2,420.30 owed to Dr. Garmon out of the settlement funds, and Dr. Garmon had a "just claim" with respect to those funds.[24]

Despite Mr. Bailey's awareness that he had signed the authorization, and that by signing he had "agree[d] to withhold such sums [as due and owing to Dr. Garmon] from any settlement," he nevertheless borrowed monies from the settlement funds. On September 26, 1991, the day before he

---

23. The report described the injuries Ms. Haile suffered as a result of the incident.

24. Dr. Garmon also may have had "an equitable charging lien." We have considered previously whether, under the common law, "a validly created charging lien attach[es] to proceeds of settlement when the settlement fund out of which the attorney seeks payment is within the possession or control of the court." See Elam v. Monarch Life Ins. Co., 598 A.2d 1167, 1168 (D.C.1991) (en banc) (concluding that under the circumstances presented in that case, an attorney's charging lien was created). We have never before addressed whether a similar charging lien may be created in favor of doctors who render medical or other services to an attorney's client. In a subsequent case, again involving a lawyer's claim against a client for attorney's fees, however, we further explained that:

> In order for a charging lien to attach in this jurisdiction, "it is indispensable that there exist between the client and his attorney an agreement from which the conclusion *may reasonably be reached* that they contracted with the understanding that the attorney's charges were to be paid out of the judgment recovered." *Elam, supra* note 5, 598 A.2d

at 1169 (quoting *Pink v. Farrington,* 67 App. D.C. 314, 316, 92 F.2d 465, 467, *cert. denied,* 302 U.S. 741, 58 S.Ct. 143, 82 L.Ed. 572 (1937)). A charging lien does not depend upon an agreement that the attorney shall have a *lien* upon the judgment; in fact, only in the absence (or inadequacy of) of an express lien does the question of a possible equitable lien arise. 1 SPEISER § 2.33.

For this reason we have at times, somewhat confusingly perhaps, referred to charging liens as "contract liens," even though they arise by operation of law in the absence of an express agreement between the parties to create a lien. The "contract" referred to in the charging lien situation is simply the agreement that the attorney's fees will be paid out of the judgment, as a result of which an equitable lien is created by operation of law. This is quite different from a contract expressly creating a lien securing the attorney's fees, which the law enforces in accordance with the terms of the agreement.

*Wolf v. Sherman,* 682 A.2d 194, 197–98 and n. 5 (D.C.1996) (other citations omitted). A similar analysis could be made, by analogy, in the case before us.

received the $25,000 settlement funds, and at a time when his client's Trust Account showed a balance of $931.38, Mr. Bailey drafted and signed two documents. The first, also signed by Ms. Haile, was a settlement disbursement sheet showing sums due and owing to Mr. Bailey, the hospital, Dr. Garmon, Dr. Davis, Pain and Therapy Group, Neurodiagnostic Associates, and Ms. Haile. The settlement disbursement sheet also contained the following sentence: "Further, your [Ms. Haile's] authorization has been given for my office to borrow the funds awarded to use as deemed appropriate." The second document, signed only by Mr. Bailey was a promissory note of $5,425.86 at 5% interest, reflecting Ms. Haile's loan to Mr. Bailey, his promise to repay Ms. Haile the loan sum plus 5% interest, and his promise to pay Ms. Haile any funds attributable to his successful effort to persuade the medical providers to accept a lesser sum than that owed. Mr. Bailey then proceeded to borrow virtually all of the settlement funds received on September 27, 1991, and did not pay Dr. Garmon until around October 23, 1992, and began to pay Ms. Haile's other medical providers in January 1993.

■ Since Dr. Garmon had a "just claim" when Mr. Bailey received the settlement monies from Ms. Haile's case, we now turn to Bar Counsel's argument that Mr. Bailey engaged in misappropriation. This court has reiterated on many occasions that "[m]isappropriation is defined as any 'unauthorized use by an attorney of a client's funds entrusted to him or her, whether or not temporary or for personal gain or benefit.'" *In re Davenport*, 794 A.2d 602, 603 (D.C.2002) (quoting *In re Choroszej*, 624 A.2d 434, 436 (D.C.1992)). "[M]isappropriation occurs when the balance in the account where entrusted funds are deposited falls below the amount that the attorney is required to hold on behalf

of the client and/or third party." *Id.* at 603. "Improper intent need not be shown." *In re Berryman, supra,* 764 A.2d at 768 (quoting *In re Ray*, 675 A.2d 1381, 1386 (D.C.1996) (other citation omitted)). "Misappropriation cases decided after *In re Addams, supra,* generally have fallen into three categories: (1) intentional misappropriation, (2) reckless misappropriation, and (3) negligent misappropriation." *In re Carlson*, 802 A.2d 341, 348 (D.C. 2002).

■ "Because of the seriousness of a misappropriation offense, we have adhered to a standard of presumptive disbarment since 1990, except in cases of negligent misappropriation, or extraordinary circumstances." *In re Carlson, supra,* 802 A.2d at 348. "To ensure that we reach consistent dispositions, we necessarily compare the instant case with prior cases in terms of the misconduct issue, the attorney's disciplinary history, and any legitimate mitigating or aggravating circumstances." *In re Edwards*, 870 A.2d 90, 94 (D.C., 2005). "The ultimate issue—whether a particular sanction is warranted or not in a given case—requires us also to consider the individual qualifications and fitness of the attorney whose case is before us and, especially, the paramount need to protect the public, the courts, and the legal profession." *Id.*

■ We are satisfied that, on this record, Bar Counsel established Mr. Bailey's misappropriation of Ms. Haile's settlement funds by clear and convincing evidence. Under Rule 1.15(a) and (b) Dr. Garmon had a "just claim" to the settlement funds. Nevertheless, Mr. Bailey persuaded Ms. Haile, an immigrant from Eritrea whose command of English was not strong, to let him borrow the settlement money, which included the $2,240.30 owed to Dr. Gar-

mon.[25] Although Mr. Bailey signed a promissory note signaling the loan of the settlement funds to him, the amount owed to Dr. Garmon, $2,240.20, was not Ms. Haile's to lend, and Mr. Bailey did not suggest that Ms. Haile retain other counsel to review his loan request and his proposed promissory note. Nor did he advise Ms. Haile as to the prevailing rate of interest.[26] In addition, Mr. Bailey failed to seek authority from Dr. Garmon to borrow the funds owed to the doctor. Thus, when Mr. Bailey's trust account fell below the $2,240.30 owed to Dr. Garmon, and the sums owed to the other medical providers, misappropriation occurred. *See In re Davenport*, 794 A.2d at 603. Indeed, by August 18, 1992, two months before Mr. Bailey sent payment to Dr. Garmon, Mr. Bailey's trust account showed only 0.11 cents remaining from the $25,000 settlement check.

 The question now becomes whether the misappropriation was negligent, reckless, or intentional. Bar Counsel argues that Mr. Bailey's culpability was more than mere negligence. Bar Counsel agrees with the hearing committee's finding that the misappropriation committed by Mr. Bailey could not "be attributable to mere 'inadvertence.'" Because the hearing committee failed to find the "usual mitigating factors, let alone any extraordinary mitigating factors," it recommended a sanction of disbarment. Bar Counsel agrees that Mr. Bailey should be disbarred because his actions fell in line with other intentional misappropriation cases. The Board, however, asserts that although it maintains that there was no misappropriation, if misappropriation is found, it merely amounted to negligence, and that Mr. Bai-

ley's actions warranted a nine-month suspension.

As we have stated, misappropriation cases generally fall into three categories: (1) intentional misappropriation, (2) reckless misappropriation, and (3) negligent misappropriation. *See In re Carlson, supra*, 802 A.2d at 348. Here, the record indicates that Mr. Bailey used exceedingly poor judgment, but nevertheless acted under an "honest but mistaken belief" that the authorization did not convey Dr. Garmon a "right" to or an "interest" in the settlement funds, that the executed promissory note allowed him to borrow the settlement money, and that he had the authority to defer payment to Dr. Garmon and the other medical providers. The document on its face was expressly entitled "[a]uthorization," not "[a]uthorization and [a]ssignment." Moreover, Mr. Bailey did not try to hide his borrowing of the settlement funds. Indeed, he was never charged with dishonesty under the Rules of Professional Conduct. He executed a "standard" promissory note enabling him to borrow $5,425.86 and included language in the settlement disbursement sheet which allowed him to borrow the entire settlement amount, including those funds earmarked for the medical providers. Mr. Bailey testified that he always intended to pay the medical providers, but that there would be a "deferral of payment" so he could use the funds to support his new firm. In fact, he prepared a disbursement sheet which listed the medical providers and the fees owed to each of them but which also stated that Ms. Haile, who signed the settlement disbursement sheet, gave him authority "to borrow the funds awarded to use as deemed appropriate."

**25.** Mr. Bailey violated Rule 1.15(b) when he failed to promptly notify and pay Dr. Garmon the monies owed to him.

**26.** Mr. Bailey failed to provide any authority to support his contention that the promissory note trumped the authorization form.

Under these circumstances, although Mr. Bailey used exceedingly poor judgment, we are satisfied that Mr. Bailey's misappropriation was negligent, rather than intentional or reckless.

 Finally, we consider the appropriate sanction. "A six-month suspension without a fitness requirement is the norm for attorneys who have committed negligent misappropriation of entrusted funds together with related violations (commingling, deficient record keeping) ...." *In re Edwards,* 870 A.2d 90, 94 (D.C.2005). Disbarment is the appropriate sanction in most cases where intentional [or reckless] misappropriation is found. *In re Addams, supra,* 579 A.2d at 190.

Seven of the nine Board members recommended a nine-month suspension for Mr. Bailey's violations of the Rules of Professional Conduct. Included were the four Board members who determined that Mr. Bailey engaged in misappropriation, but that "Bar Counsel did not satisfy her burden of establishing that the misappropriation was intentional or reckless." Although a six-month suspension is the usual sanction for negligent misappropriation, *see Davenport, supra,* the board majority recommends a nine-month suspension because of the serious nature of all of Mr. Bailey's violations. Indeed, in addition to commingling and negligent misappropriation, Mr. Bailey failed to respond when Dr. Garmon inquired about Ms. Haile's settlement and demanded payment. Dr. Garmon was compelled to file a complaint with Bar Counsel. Moreover, when Mr. Bailey's role with Ms. Haile changed from advocate and counselor to borrower, Mr. Bailey did not withdraw from representing her. Nor did he advise her to see other counsel. We conclude that a nine-month suspension in this case "would [not] foster a tendency toward inconsistent dispositions for comparable conduct or would oth-erwise be unwarranted." D.C. Bar R. XI, § 9(g)(1); *see also In re Mitchell,* 822 A.2d 1106, 1110 (D.C.2003). Consequently, we accept the Board majority's recommendation.

Accordingly, it is therefore ORDERED that Samuel Bailey, Jr., is suspended from the practice of law in the District of Columbia, for nine months, effective thirty days from the date of this opinion.

SCHWELB, Associate Judge, concurring:

I agree with the sanction that the court imposes and with much of my colleagues' analysis, including the conclusion that Mr. Bailey engaged in negligent misappropriation. I do not join the opinion, however, because in my view, much that the court has written is dictum addressing two questions the resolution of which, in the final analysis, can have no effect on the outcome of the case.

The court focuses at some length on whether the authorization executed by the client effected an assignment of settlement proceeds to Dr. Garmon and whether Dr. Garmon was an expert witness and therefore had a lien on the recovery. These are not easy questions, and the court answers each of them in the negative, or favorably to Mr. Bailey. Any encouragement that this may have brought Mr. Bailey was short-lived, however, for my colleagues then proceed to hold—and I agree—that Mr. Bailey's conduct constituted misappropriation, albeit negligent misappropriation.

Obviously, the court's resolution of the "assignment" and "expert witness" issues makes no difference to its disposition of the case. If the authorization had effected an assignment, and if Dr. Garmon were entitled to a lien as an expert witness, the court would still conclude, perhaps *a fortiori,* that misappropriation occurred. In

my opinion, we should not ordinarily undertake to resolve difficult issues which do not affect the end result. Regardless of how diligently counsel have argued these issues and crossed rhetorical swords on them, the court's resolution of them is still dictum. Perhaps the court's discussion will provide "guidance" to the Board and to counsel, but in my view, we should resist the temptation to provide guidance by dictum.